**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------- x
MELANIE L. CYGANOWSKI,      :
AS RECEIVER FOR PLATINUM      :
PARTNERS CREDIT OPPORTUNITIES   :     Civil Action No.
MASTER FUND LP, AND, IN THAT     :     21-cv-00888 (BMC)
CAPACITY, AS AGENT ON BEHALF OF  :
ALPHA CREDIT RESOURCES LLC,    :
                                  :
          Plaintiff,       :
                                  :
        -v-            :
                                  :
DECISION DIAGNOSTICS CORP.,    :
                                  :
          Defendant.     :
-------------------------------------------------------- x

## FIRST AMENDED COMPLAINT

Plaintiff Melanie L. Cyganowski, (i) in her capacity as receiver (the "***Receiver***") for

Platinum Partners Credit Opportunities Master Fund LP ("***PPCO Master***"), and (ii) in that capacity,

as agent on behalf of PPCO Master's wholly owned subsidiary Alpha Credit Resources LLC f/k/a

Centurion Credit Resources LLC (collectively, "***ACR***"), for her First Amended Complaint against

defendant Decision Diagnostics Corp. ("***Decision Diagnostics***"), alleges as follows:

## NATURE OF THIS ACTION

1.     The Receiver is currently holding certificates for shares of preferred and common

stock in Decision Diagnostics issued to ACR (collectively, the "***Certificates***"), including 447,540

Series E preferred shares (the "***Series E Preferred Shares***"), 1,000 Series B preferred shares (the

"***Series B Preferred Shares***," together with the Series E Preferred Shares, the "***Preferred***

***Shares***"), and 2,296 shares of common stock (the "***Common Shares***," together with the Preferred

Shares, the "***Shares***").[1]  Decision Diagnostics – a medical testing company that, along with its recently indicted Chief Executive Officer ("***CEO***"), Keith Berman ("***Berman***"), is a defendant in a civil enforcement proceeding commenced by the United States Securities and Exchange Commission (the "***SEC***") – is (i) improperly preventing the Receiver from liquidating the Preferred Shares for the benefit of ACR, its sole parent, PPCO Master, and the Receivership Estate (as defined below) and its stakeholders by refusing to convert the Preferred Shares into common stock; (ii) unjustifiably refusing to remove restrictive legends from the Shares, thereby preventing the Receiver from selling the Shares on the open market; and (iii) claiming to have canceled the Shares, without any basis for doing so.

2.　　As set forth below:

- ACR earned all of the Shares in exchange for extending credit to Decision Diagnostics' wholly-owned subsidiary, PharmTech Direct Corp. ("***PT Direct***"), converting millions of dollars of loans made by ACR into equity in Decision Diagnostics, and expanding an existing line of credit to PT Direct and/or Decision Diagnostics.  ACR did not obtain any of the Shares through fraud.  Consequently, Decision Diagnostics had, and has, no right to cancel any of the Shares and is obligated to reverse any cancellation of the Shares (and, if canceled, to reinstate or reissue any such Shares).

---

[1] The Shares are represented by:  (a) certificate numbers 1011-1040, each for 33 shares of Series B preferred stock; certificate number 1041, for 10 shares of Series B preferred stock; (b) certificate numbers 1335-1340, each for 35,714 shares of Series E preferred stock; certificate number 1342, for 32,146 shares of Series E preferred stock, certificate numbers 1330 and 1331, each for 70,000 shares of Series E preferred stock, certificate number 1332, for 60,000 shares of Series E preferred stock, certificate number 1190, for 100 shares of Series E preferred stock, certificates 1136 and 1149, each for 500 shares of Series E preferred stock, and certificate 1366, for 10 shares of Series E preferred stock; and (c) certificate number 13205, for 39 shares of common stock, certificate number 13209, for 149 shares of common stock, certificate number 13572, for 1228 shares of common stock, certificate number 14025, for 68 shares of common stock, certificate number 14026, for 306 shares of common stock, certificate number 14027, for 268 shares of common stock, and certificate number 14101, for 238 shares of common stock.  The "Certificates" are the certificates for the Shares.  The Receiver reserves her rights, as Receiver and agent, with respect to any Decision Diagnostics shares she may hold that are not the subject of this action.

- Decision Diagnostics was and is required to convert each of the Series B Preferred Shares into 15,000 shares of common stock and each of the Series E Preferred Shares into 14 shares of common stock.

- Decision Diagnostics was and is required to remove the restrictive legends from the Shares.

- Decision Diagnostics has refused, and is refusing, to perform the foregoing obligations, and is refusing to provide, and blocking the transfer agent, Action Stock Transfer Corporation (the "***Transfer Agent***"), from providing, information to ACR relating to the Shares.

- Decision Diagnostics has thereby breached, and continues to breach, its express obligations to ACR under both Decision Diagnostics' organizational documents and its loan agreements with ACR or, at least, the implied covenant of good faith and fair dealing thereunder. Decision Diagnostics also has violated, and continues to violate, its obligations to ACR under Nevada Rev. Stat. ("***NRS***") §§ 78.211 and 104.8401; has unjustly enriched, and continues to unjustly enrich, itself at the expense of ACR; and has converted, and continues to convert, assets of ACR that are property of the Receivership Estate.

- Decision Diagnostics also has violated, and continues to violate, the Second Amended Order Appointing Receiver entered on October 16, 2017 (together with its predecessors, collectively, the "***Receivership Order***") in *SEC v. Platinum Management (NY) LLC*, No. 16-6848 (E.D.N.Y.) (the "***Receivership Action***").

- Decision Diagnostics' wrongful actions are causing irreparable harm to ACR, PPCO Master and the Receivership Estate, for which there is no adequate legal remedy. Decision Diagnostics is preventing the Receiver from carrying out her duties as Receiver to monetize the Shares, and thereby from closing out the Receivership Estate. Further, Decision Diagnostics is insolvent and its insolvency will further deepen as a result of the SEC's recent commencement of a civil enforcement proceeding against it and Berman, thereby rendering any award of money damages against Decision Diagnostics inadequate. Additionally, if Decision Diagnostics did cancel any of the Shares (as it claims) and reissued or reissues them to others, then multiple parties might assert conflicting rights in the Shares. Moreover, Decision Diagnostics is placing the Receiver in the impossible position of having to choose between (a) sending the original Certificates for the Shares to Decision Diagnostics or the Transfer Agent in order to have the Preferred Shares converted into common stock and have the restrictive legends removed, or (b) not sending the original Certificates to Decision Diagnostics or the Transfer Agent, in order to avoid the risk that Decision Diagnostics and/or Berman may engage in further improper actions with respect to the Shares once in their custody.

- Since Decision Diagnostics will not sustain irreparable harm if an order of specific performance and/or a permanent injunction is entered and has no legitimate rights to be protected here, the balancing of the equities tips decidedly in favor of the

Receivership Entities, ACR and the stakeholders in ACR, and against Decision Diagnostics.

3. Accordingly, the Receiver is entitled to judgment granting her at least the following relief:

- a declaratory judgment that: (i) ACR earned and owns the Shares; (ii) Decision Diagnostics had no right to cancel any of the Shares; (iii) Decision Diagnostics is required to reverse its purported cancellation of the Shares and to reinstate and reissue any of the Shares that were canceled; (iv) Decision Diagnostics is required to convert the Preferred Shares into common shares at conversion rates of 15,000 common shares for each of the Series B Preferred Shares and 14 common shares for each of the Series E Preferred Shares; (v) Decision Diagnostics is required to cooperate with, and provide such information to, the Receiver and all other persons and entities insofar as necessary to carry out those obligations; and (vi) Decision Diagnostics is required to stop blocking the Receiver's attempts to obtain information from and to interact with the Transfer Agent;

- an Order of specific performance directing Decision Diagnostics to comply with its contractual and statutory obligations under NRS §§ 78.211 and 104.8401: (i) to reverse its purported cancellation of and recognize the Shares; (ii) to reinstate and reissue to ACR any of the Shares that Decision Diagnostics may have canceled; (iii) to convert the Series B Preferred Shares and the Series E Preferred Shares into common stock at conversion rates of 15,000 common shares for each of the Series B Preferred Shares and 14 common shares for each of the Series E Preferred Shares; (iv) to remove, or cause the removal of, the restrictive legends from the Shares; (v) to cooperate with, and provide such information to, the Receiver and such other persons or entities as necessary to effectuate such reversal, reinstatement, reissuance, conversion and removal, and in the Receiver's efforts to liquidate the Shares; and (vi) to stop interfering with the Receiver's attempts to interact with the Transfer Agent; and

- a permanent injunction, based upon Decision Diagnostics' continuing violations of contract, the implied covenant of good faith and fair dealing, and NRS §§ 78.211 and 104.8401, unjust enrichment, ongoing conversion of the Shares and violations of the Receivership Order, consistent with the foregoing.

4. In the alternative, if the Court declines to award specific performance and to issue permanent injunction for any reason (such as based upon a determination that the Receiver has an adequate remedy at law), then the Receiver is entitled to recover money damages from Decision Diagnostics on claims for breach of contract, breach of the covenant of good faith and fair dealing, unjust enrichment, conversion, violations of NRS §§ 78.211 and 104.8401, and

violations of the Receivership Order.  By wrongfully refusing to remove the restrictive legend from the Shares and to convert the Preferred Shares into common stock and claiming to have canceled the Shares, Decision Diagnostics prevented the Receiver and ACR from selling the Shares as Decision Diagnostics' common stock closed at prices as high as $0.435 per share. Because the Shares have a common equivalent of 21,267,856 shares, Decision Diagnostics' wrongful actions prevented the Receiver and ACR from realizing millions of dollars from the sale of the Shares.  Accordingly, if the Court determines that the Receiver is not entitled to injunctive relief or specific performance from the Receiver, then the Receiver is entitled to recover money damages from Decision Diagnostics on her claims for breach of contract, breach of the covenant of good faith and fair dealing, unjust enrichment, conversion, violations of NRS §§ 78.211 and 104.8401, and violations of the Receivership Order.

## THE PARTIES

### A.      The Receiver, the Receivership Entities and ACR

5.      The Receiver resides in this judicial district.  She is the duly appointed Receiver of PPCO Master and the other entities defined below as the "Receivership Entities" (with the estate created by the receivership being the "***Receivership Estate***").  (ECF[2] Nos. 6, 216 and 276).

6.      Following the resignation of Bart M. Schwartz, Esq. (the "***Prior Receiver***") as receiver for Platinum Credit Management, L.P., PPCO Master, Platinum Partners Credit Opportunities Fund (TE) LLC, Platinum Partners Credit Opportunities Fund LLC, Platinum Partners Credit Opportunity Fund (BL) LLC, Platinum Liquid Opportunity Management (NY) LLC, and Platinum Partners Liquid Opportunity Fund (USA) L.P. (the "***Original Receivership***

---

[2] Unless otherwise stated, references to "ECF No. __" refer to filings in the Receivership Action.

*Entities*"), on July 6, 2017, the Receiver was appointed as successor receiver for the Original Receivership Entities. (Minute Order dated July 6, 2017, ECF No. 216; ECF No. 276 ¶ 2).

7. On December 28, 2017, the following additional entities were placed in receivership under the Receiver's control: Platinum Partners Liquid Opportunity Master Fund L.P., Platinum Partners Credit Opportunities Fund International Ltd., and Platinum Partners Credit Opportunities Fund International (A) Ltd. (with the Original Receivership Entities, the "***Receivership Entities***"). (ECF No. 297).

8. The Receiver's powers and duties as Receiver are set forth in the Receivership Order. (ECF No. 276). They include the following "general powers and duties":

- "To take custody, control and possession of all Receivership Property [defined as "all property interests of the Receivership Entities, including, but not limited to, monies, funds, securities, credits, effects, goods, chattels, lands, premises, leases, claims, rights and other assets, together with all rents, profits, dividends, interest or other income attributable thereto, of whatever kind, which the Receivership Entities own, possess, have a beneficial interest in, or control directly or indirectly"]; to sue for and collect, recover, receive and take into possession from third parties all Receivership Property and records relevant thereto";

- "To . . . hold in the Receiver's possession, custody and control all Receivership Property . . ."";

- "To use Receivership Property for the benefit of the Receivership Estate . . ."";

- "To take any action which, prior to the entry of this Order, could have been taken by the officers, directors, managers, managing members, and general and limited partners, and agents of the Receivership Entities"; and

- "To take such action as necessary and appropriate for the preservation of Receivership Property or to prevent the dissipation or concealment of Receivership Property . . . ."

(Receivership Order, ¶¶ 6A, 6B, 6C, 6D, 6E, 6G).

9. PPCO Master served as the master fund in a master-feeder hedge fund structure. It invested, directly or through its subsidiaries, in debt and private equity investments primarily in

early stage companies in the energy, technology and biomedical industries that generally did not have the financial wherewithal to avail themselves of traditional capital markets.

10.    Since 2016, PPCO Master has been the sole owner of the membership interests in, and the managing member of, ACR.  Thus, at all times since 2016, the Receiver has had the authority "[t]o take any action [on behalf of ACR] which, prior to the entry of [the Receivership Order], could have been taken by the officers, directors, managers, managing members, and general and limited partners, and agents of [PPCO Master]" with respect to ACR arising from PPCO Master's status as the sole and managing member of ACR.  (Receivership Order ¶ 5E).

**B.    Decision Diagnostics**

11.    Decision Diagnostics (formerly known as instaCare Corp. ("***InstaCare***")) is, and at all relevant times has been, a corporation organized under the laws of Nevada having its executive offices in Westlake Village, California.

12.    At all relevant times, Decision Diagnostics' shares of common stock have been publicly traded on the over-the-counter market, formerly Pink Sheets (under the ticker symbol: ISCR), now OTC (under the ticker symbol: DECN).  Decision Diagnostics' common stock is "restricted" and "unregistered," meaning that no registration statement was filed, and, thus, that its common stock can be sold only if certain requirements under Rule 144 under the Securities Act of 1933, including a "holding period" of one year (or in certain circumstances six months), are met.

13.    Decision Diagnostics' public reporting indicates that Berman is, and since 2003 has been, Chief Financial Officer ("***CFO***"), Secretary, Treasurer and a director, and is, and since July 2017 has also been, CEO of Decision Diagnostics.

14.    At all relevant times through at least the end of 2019, PT Direct was a wholly-owned subsidiary of Decision Diagnostics.

15.     Decision Diagnostics is, and at all relevant times has been, a self-described "worldwide prescription and non-prescription diagnostics and home testing products distributor" and the manufacturer of glucose test strips, for humans, dogs, cats and horses.

16.     In a press release issued on March 3, 2020, Decision Diagnostics announced the introduction of a "new screening methodology for the Coronavirus (Covid19)."

17.     On March 2, 2020, on the eve of that press release, Decision Diagnostics' stock price closed at $0.019/share.  By March 12, 2020, the stock price had jumped five-fold to close at $0.0974/share.  Thereafter, Decision Diagnostics' stock closed as high as $0.435/share on August 5, 2020.

18.     On April 23, 2020, the SEC suspended trading of Decision Diagnostics' stock through May 7, 2020 due to "questions regarding the accuracy and adequacy of information in the marketplace since at least March 3, 2020."  In a subsequent proceeding commenced by Decision Diagnostics to challenge that temporary suspension, the SEC asserted that Decision Diagnostics' public statements were inaccurate, misleading and/or unsupported.

19.     On December 15, 2020, at the request of the United States Department of Justice (the "***Government***"), a grand jury indicted Berman for securities fraud under 15 U.S.C. §§ 78j & 78ff and 17 C.F.R. § 240.10b5, and for allegedly knowingly and willfully making materially false, fictitious and fraudulent statements in violation of 18 U.S.C. § 1001, regarding, among other things, Decision Diagnostics' purported development of a COVID-19 test.  (*United States v. Berman*, 20-cr-00278-TNM (D.D.C.), ECF No. 1 (the "***Berman Indictment***")).

20.     On December 17, 2020, the Berman Indictment was unsealed in the United States District Court for the District of Columbia.  (*Id.*)

21.     Also on December 17, 2020, the SEC commenced a civil enforcement proceeding against Decision Diagnostics and Berman in the United States District Court for the Southern District of New York, asserting claims for violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder (the "***Decision Diagnostics Enforcement Proceeding***"), based upon, *inter alia*, allegations that they issued multiple false and misleading press releases regarding a Covid-19 testing kit that they claimed to be developing. (*SEC v. Berman*, *et al.*, 20-cv-10658, Complaint at ¶¶ 1-4, 11-59 (S.D.N.Y. Dec. 17, 2020), ECF No. 1).

22.     Decision Diagnostics' stock closed on February 17, 2021 at $0.018/share, and thereafter continued to decline.

## JURISDICTION AND VENUE

### A.     Subject Matter Jurisdiction

23.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1367(a) because: (a) this Court has original jurisdiction over the Receivership Action, wherein all assets of the Receivership Entities were placed in the custody of this Court and the Receiver was charged with the duty of managing the estate and property entrusted to her care and collecting property belonging to the Receivership Entities from all third parties; (b) through the present action, the Receiver seeks to fulfill the duties assigned to her by this Court in the Receivership Action, including "to sue for and collect, recover, receive and take into possession from third parties all Receivership Property," including the Shares (*see* Receivership Order, ¶ 6.B); (c) the issues raised by the Receiver's claims arise under the Receivership Order and have a material impact on the administration of the Receivership Estate; and (d) the Receivership Order provides that "[t]his Court continues to take exclusive jurisdiction and possession of the assets, of whatever kind and wherever situated, of the Receivership Entities (the 'Receivership Assets')." (Receivership Order, ¶ 1).

24.     In addition, or in the alternative, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because the Receiver and Decision Diagnostics are citizens of different States and the amount in controversy exceeds $75,000 because (a) the value of the injunction sought by the Receiver exceeds that amount, and (b) if the Court determines that the Receiver has an adequate remedy at law, then the amount of damages recoverable by the Receiver on behalf of ACR will exceed $75,000.

**B.    Venue**

25.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) and paragraph 1 of the Receivership Order.

**C.    Personal Jurisdiction**

26.     This Court has personal jurisdiction over Decision Diagnostics under the Due Process Clause of the Fourteenth Amendment to the United States Constitution and Sections 301 and 302 of the New York Civil Practice Law and Rules. Decision Diagnostics purposefully availed, and continues to avail, itself of the laws and protections of the State of New York, transacted business within the State of New York, had, and continues to have, contacts with the State of New York that are systematic and continuous in connection with the transactions, occurrences and wrongful actions at issue in this action, and committed, and continues to commit, torts and breaches of contract both within and outside the State of New York against ACR, a New York resident, in connection with the transactions, occurrences and wrongful actions referred to below, including by, among other things:

- intentionally and repeatedly directing its actions, including, without limitation, its breaches of contract, bad faith and tortious actions, statutory violations and other violations of ACR's, the Receiver's and PPCO Master's rights, at the State of New York and at persons and entities located and residing within the State of New York, including, without limitation, ACR, PPCO Master, the Receiver, Tarter Krinsky & Drogin LLP, the escrow agent for the Shares (the "***Escrow Agent***"), and ACR's broker and agent, JH Darbie & Co. ("***Darbie***"), located in New York, New York;

- engaging in telephone calls with, sending and causing to be sent (i) emails, (ii) items through the U.S. mail and by couriers and/or (iii) facsimiles and/or other electronic or written communications to, and causing deliveries to be made to, persons and entities within the State of New York related to the negotiation, execution, and breach of the agreements detailed herein, the Shares at issue, and the torts, statutory violations and other violations of the Receiver's, ACR's, its stakeholders and PPCO Master's rights detailed herein;

- participating in meetings within the State of New York with representatives and agents of ACR and PPCO Master and other persons or entities related to the subject matter of this action, including, without limitation, the negotiation of and/or breach of one or more of the loan agreements at issue in this action;

- delivering, and causing numerous shares of stock in Decision Diagnostics, including the Shares, to be delivered to the Escrow Agent and to ACR in New York City; instructing and causing the Escrow Agent to hold those shares, including the Shares, within the State of New York for years; and directing and causing those shares, including the Shares, to be issued to ACR and delivered by the Escrow Agent, a New York City law firm, to ACR within the State of New York;

- causing the Escrow Agent in New York City to issue legal opinions, including Rule 144 opinions, with respect to shares issued by Decision Diagnostics;

- purporting to cancel the Shares, which are the property of ACR and the Receiver – both based in New York State – and thereby interfering with their contractual and other legal rights, including under the Receivership Order;

- breaching the applicable agreements and the covenant of good faith and fair dealing, enriching itself, and violating applicable statutes by failing and refusing to take actions that required interacting with New York parties and sending material to New York;

- violating the Receivership Order, which Decision Diagnostics knew was issued by a Court within the State of New York, and thereby knowingly interfering with property of a New York entity under the control of a Receiver residing and maintaining her only office in New York State, and intentionally causing economic injury to ACR, PPCO Master and the Receiver within the State of New York;

- upon information and belief, directing other conduct at the State of New York in connection with its wrongful conduct as described herein, the knowledge and evidence of which is solely within the possession of Decision Diagnostics or third parties; and

- engaging in tortious conduct within the State of New York and/or tortious conduct outside of the State of New York causing injury to ACR, PPCO Master and the Receiver within the State of New York, at a time when Decision Diagnostics (i) regularly does or solicits business, or engages in any other persistent course of

conduct, or derives substantial revenue from goods used or consumed or services rendered, in New York State, or (ii) expects or should reasonably expect its acts to have consequences in New York State and derives substantial revenue from interstate or international commerce.

27. This Court also has personal jurisdiction over Decision Diagnostics pursuant to 28 U.S.C. §§ 754 and 1692 because the Shares, which are the subject of this action, are assets of the Receivership Estate as provided for in the Receivership Order.

28. Pursuant to 28 U.S.C. § 754, the Receivership Order was filed in the United States District Court for the District of Nevada on or about December 12, 2018, Case No. 18-ms-00113 (D. Nev.) and in the United States District Court for the Central District of California on or about November 7, 2018, Case No. 18-mc-00154 (C.D. Cal.).

## FACTS COMMON TO ALL CLAIMS

I. **Decision Diagnostics' Issuance of the Shares in Exchange for ACR's Conversion of Outstanding Debt**

A. **Decision Diagnostics' Organizational Documents**

29. At all material times hereinafter mentioned, Decision Diagnostics' organizational documents have authorized it to issue, and it has issued, several classes of stock, including, among others, common stock ("***Common Stock***"), Series B preferred stock ("***Series B Preferred Stock***") and Series E preferred stock ("***Series E Preferred Stock***").

30. On March 2, 2001, Decision Diagnostics filed "Articles of Incorporation" dated February 13, 2001 and related documents (collectively, the "***Articles of Incorporation***") with the Nevada Secretary of State, and thereafter updated those documents from time to time. The Articles of Incorporation can be accessed on the SEC Electronic Data Gathering, Analysis, and Retrieval system ("***EDGAR***") at:

https://www.sec.gov/Archives/edgar/data/1144225/000107878218000766/f1aoffering_21.htm.

31.     Section 4 of the Articles of Incorporation authorizes Decision Diagnostics to issue "Common Stock" ("**Common Stock**") and "Preferred Stock" and provides: "The Common and/or Preferred Stock of the Company may be issued for such consideration as may be fixed from time to time by the Board of Directors."

32.     Upon information and belief, Decision Diagnostics has enacted bylaws entitled "Bylaws of Decision Diagnostics Corp.," dated June 13, 2017 (the "**Bylaws**"). Decision Diagnostics filed the Bylaws with the SEC on July 31, 2018. The Bylaws can be accessed at: (https://www.sec.gov/Archives/edgar/data/1144225/000107878218000766/f1aoffering_26.htm).

33.     Article VII, Section 1 of the Bylaws, entitled "Certificates for Shares," provides, in pertinent part:

> All certificates surrendered to the corporation for transfer shall be canceled and no new certificate shall be issued until the former certificate for a like number of shares shall have been surrendered and canceled, except that in the case of a lost, destroyed or mutilated certificate, a new one may be issued therefor upon such terms and indemnity to the Corporation as the Board of Directors may prescribe.

34.     On December 23, 2011, Decision Diagnostics filed with the Nevada Secretary of State a document entitled "Ammendment [*sic*] to Certificate of Designations of Preferences and Rights of Series E Convertible Preferred Stock of InstaCare Corp., a Nevada Corporation, after Shares Have Been Issued," dated December 17, 2011 (the "**Series E Amendment**").

35.     In paragraph 2(b) of the Series E Amendment, Decision Diagnostics authorized the issuance of 1,250,000 shares of Series E Preferred Stock.

36.     On December 4, 2013, Decision Diagnostics filed with the Nevada Secretary of State a document entitled "Certificate of Ammendment [sic] of Designations of Preferences and Rights of Series B Convertible Preferred Stock of Decision Diagnostics Corp., a Nevada Corporation," dated December 4, 2013 (the "**Series B Amendment**").

37.     In paragraph 2(b) of the Series B Amendment, Decision Diagnostics authorized the issuance of 15,000 shares of Series B Preferred Stock.

38.     Paragraph 2(f)(i)(A) of the Series E Amendment, which appears in paragraph 2(f) thereof entitled "Conversion Rights," provides:

> Each share of Series E Preferred Stock shall be convertible, at the option of the holder thereof, at any time and from time to time, and without the payment of additional consideration by the holder thereof, into fourteen (14) (the "**Conversion Rate**") fully paid and nonassessable shares of Common Stock. Such Conversion Rate shall be subject to adjustment as provided herein.

39.     Paragraph 2(f)(i)(A) of the Series B Amendment, which appears in paragraph 2(f) thereof entitled "Conversion Rights," is identical to paragraph 2(f)(i)(A) of the Series E Amendment, except that it refers to a "Conversion Rate" of one share of Series B Preferred Stock into 15,000 shares of Common Stock.

40.     Paragraph 2(f)(iii) of the Series E Amendment and paragraph 2(f)(iii) of the Series B Amendment, both entitled "No Impairment," provide (with differences in the language of the Series B Amendment in brackets):

> The Corporation will not, by amendment of its Articles of Incorporation or through any reorganization, transfer of assets, consolidation, merger, dissolution, issue or sale of securities or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms to be observed or performed hereunder by the Corporation, but will at all times in good faith assist in the carrying out of all the provisions of this paragraph (f) and in the taking of all such action as may be necessary or appropriate in order to protect the Conversion Rights of the holders of the Series E [Series B] Preferred Stock against impairment.

41.     Paragraphs 2(f)(i)(A) and 2(f)(iii) of the Series E Amendment and the Series B Amendment thereby unambiguously require Decision Diagnostics to comply with requests by holders of Series E Preferred Stock and Series B Preferred Stock, such as ACR, to convert shares of Series E Preferred Stock into shares of Common Stock at the "Conversion Rate" of 1:14 and

to convert shares of Series B Preferred Stock into shares of Common Stock at a "Conversion Rate" of 1:15,000.

42. Paragraph 2(g) of the Series E Amendment and paragraph 2(g) of the Series B Amendment, entitled "Re-issuance of Preferred Stock," provide (with differences in the language of the Series B Amendment in brackets):

> Any shares of Series E [Series B] Preferred Stock acquired by the Corporation by reason of purchase, conversion or otherwise shall be canceled, and retired but shall not be eliminated from the shares of Series E [Series B] Preferred Stock that the Corporation shall be authorized to issue. All such shares shall upon their cancellation become authorized but unissued shares of Preferred "E" [Preferred "B"] Stock and may be reissued subject to the conditions and restrictions on issuance set forth in the Articles of Incorporation or in any certificate of Determination creating a series of Preferred Stock or any similar stock or as otherwise required by law.

43. The Articles of Incorporation, the Bylaws, the Series B Amendment and the Series E Amendment (collectively, the "***Organizational Documents***") are enforceable agreements between ACR and Decision Diagnostics, and Decision Diagnostics owes a duty of good faith and fair dealing to ACR thereunder.

44. None of the Organizational Documents include any provision authorizing Decision Diagnostics to cancel any shares of Common Stock, Series B Preferred Stock or Series E Preferred Stock that a shareholder earned and did not procure by fraud.

**B.  The Original Loan Agreement, the First Loan Amendment, the Note Renewal Agreement, the Second Loan Amendment, the December 2010 Letter Agreement, the Original Escrow Agreement, the Escrow Agreement and the Escrowed Shares**

45. As detailed below, in accordance with Section 4 of the Articles of Incorporation and paragraph 2(b) of each of the Series B and Series E Amendments, Decision Diagnostics issued Common Stock, Series B Preferred Stock and Series E Preferred Stock, respectively, for consideration provided by ACR under the express provisions of certain loan documents executed

15

by ACR, Decision Diagnostics and PT Direct in connection with revolving secured loans made by ACR, as lender, initially to PT Direct and ultimately to PT Direct and its parent Decision Diagnostics, as borrowers.

46.     ACR, Decision Diagnostics and PT Direct entered into a Loan and Security Agreement as of November 19, 2007 (the "***Original Loan Agreement***"; as thereafter modified, amended and restated, the "***Loan Agreement***").   Upon information and belief, Decision Diagnostics and/or its counsel sent and caused to be sent emails, faxes, mail, items by courier services and/or drafts and/or the execution copy of the Original Loan Agreement to ACR and/or its counsel in New York, New York, in connection with the negotiation and execution of, and shares issued under, that agreement, and ACR executed that agreement in New York, New York.

47.     In Section 1.1(a) of the Original Loan Agreement, ACR agreed to extend a secured, revolving line of credit of up to $1,000,000 (as subsequently increased, the "***Loan***") to PT Direct. The Loan was secured by a lien on substantially all of PT Direct's assets.

48.     In partial consideration for ACR's extension of credit, in Section 1.1(b) of the Original Loan Agreement, Decision Diagnostics agreed to issue to ACR both Common Stock (defined in the Loan Agreement as "***Delivered Shares***") and warrants convertible to Common Stock, based on a formula, upon each Advance made by ACR to PT Direct.

49.     The Original Loan Agreement further provides, in Section 1(c), that "[Decision Diagnostics] ***shall*** cause its counsel to provide a Rule 144 Opinion [stating that the shares can be sold in a public marketplace because they fall within the "safe harbor" of SEC Rule 144 and, therefore, are exempt from Rule 144's re-sale restrictions] . . . on the date which is one (1) year from the date of delivery of the Delivered Shares, in form and substance, and issued by a law

firm, acceptable to [ACR] in its sole discretion."  By its terms, the Loan Agreement is governed by the "domestic laws of the State of Nevada."  (Original Loan Agreement, § 7.14).

50.    In Section 3.6 of the Original Loan Agreement, Decision Diagnostics represented that "[t]he execution, delivery and performance of the Loan Documents have been duly authorized by all necessary corporate action and each represents a legal, valid and binding obligation of the Borrower and is fully enforceable according to its terms, except as limited by laws relating to the enforcement of creditors' rights."

51.    Section 7.10 of the Original Loan Agreement, entitled "Further Assurances," provides, in pertinent part:  "Borrower will from time to time execute and deliver to Lender, and take or cause to be taken, all such other or further action as Lender may reasonably request in order to effect and confirm or vest more securely in Lender all rights contemplated by this Agreement and the other Loan Documents …."

52.    ACR, Decision Diagnostics and PT Direct thereafter entered into an "Omnibus Loan Document Modification and Reaffirmation Agreement" (the "***First Loan Amendment***") dated as of October 20, 2008.  In Section 2 of the First Loan Amendment, ACR, Decision Diagnostics and PT Direct agreed to increase the limit of the line of credit to $2,000,000.  (First Loan Amendment § 2).  Upon information and belief, Decision Diagnostics and/or its counsel sent emails, faxes, mail and/or drafts and/or the execution copy of that agreement to ACR and/or its counsel in New York, New York, in connection with the negotiation and execution of that agreement, and ACR executed that agreement in New York.

53.    In Decision Diagnostics' 10-K for the fiscal year ended December 31, 2008  (the  "***2008  10-K***,"  a  copy  of  which  can  be  accessed  on  EDGAR,  at https://www.sec.gov/Archives/edgar/data/0001144225/000107878209000835/iscr10k123108.ht

m), Decision Diagnostics stated: "During the year ended December 31 2008, we issued 6,313,123 shares of our common stock and 66,940 shares of our preferred series 'E' stock to [ACR] pursuant to our financing agreement. These shares represent a 5% financing fee for each advance received during each of the year ended December 31, 2008. The fair value of the shares is $253,434, and has been recorded as financing fees." (2008 10-K at F-14). Decision Diagnostics caused those shares to be delivered to ACR in New York, New York.

54. ACR, PT Direct and Decision Diagnostics also entered into an "Omnibus Loan Document Modification and Reaffirmation Agreement" dated as of November 9, 2009 (the "***Note Renewal Agreement***"). Upon information and belief, Decision Diagnostics and/or its counsel sent emails, faxes, mail and/or drafts and/or the execution copy of that agreement to ACR and/or its counsel in New York, New York, in connection with the negotiation and execution of that agreement, and ACR executed that agreement in New York.

55. In the Note Renewal Agreement, the parties agreed to increase the "Maximum Credit Amount" under the Loan Agreement to $2,500,000, and that, in consideration of ACR's acceptance of a renewed note dated November 9, 2009, ACR would cause 3,000,000 shares of Common Stock, or an amount of Series E Preferred Stock that would be convertible into 3,000,000 shares of Common Stock, to be delivered to ACR (the "***First Note Renewal Shares***"). (Note Renewal Agreement, §§ 2, 3).

56. ACR, Decision Diagnostics and PT Direct entered into an "Omnibus Loan Document Modification and Reaffirmation Agreement," dated as of December 4, 2009, and effective as of November 9, 2009 (the "***Second Loan Amendment***"). In Section 2 of the Second Loan Amendment, the parties agreed to increase the "Maximum Credit Amount" under the Loan Agreement to $2,500,000. Upon information and belief, Decision Diagnostics and/or its counsel

sent and caused to be sent emails, faxes, mail, items by courier services and/or drafts and/or the execution copy of that agreement to ACR and/or its counsel in New York, New York, in connection with the negotiation and execution of, and shares issued under, that agreement, and ACR executed that agreement in New York, New York.

57.    The Second Loan Amendment also requires, among other things, that Decision Diagnostics deliver a Rule 144 Opinion one year after delivering shares to ACR.  (Second Loan Amendment §12).   It further provides, in Section 13, that "[Decision Diagnostics] hereby irrevocably authorizes [Decision Diagnostics'] transfer agent . . . to accept opinion of counsel for purposes of Rule 144 from the law firm Tarter Krinsky & Drogin LLP [*i.e.,* the Escrow Agent] or such additional counsel as Lender may designate provided such counsel is lawfully authorized to give such opinions."

58.    Decision Diagnostics issued, filed with the SEC, and posted on its website a 10-K for the year ended December 31, 2009 (the "***2009 10-K***").   A copy of the 2009 10-K can be accessed on EDGAR at:

https://www.sec.gov/Archives/edgar/data/0001144225/000107878210000754/instacare10k1231
09.htm.

59.    In the 2009 10-K, Decision Diagnostics stated, among other things:

(a)    "During the year ended December 31, 2009, we have issued 276,600 shares of our preferred Series "E' stock to [ACR] as financing fees in connection with our line of credit.  Each share of our preferred series 'E' is convertible into 50 shares of $0.001 par value common stock.  We have recorded financing fees in the amount of $352,665 in connection with these issuances."  (2009 10-K at F-18).

(b)    "On November 10, 2009, we entered into an 'Amended and Restated Promissory Note' with [ACR].  Pursuant to the amended agreement [*i.e.*, the Note Renewal Agreement], we issued 60,000 shares of our Series 'E' preferred stock as a renewal fee."  (2009 10-K at F-18).

(c)    "During the year ended December 31, 2009, we have authorized the issuance of 1,562,241 shares of common stock to [ACR] as financing fees in connection with

our line of credit. The fair value of the shares is $39,837 and has been recorded as financing costs." (2009 10-K at F-18).

60.     Thus, as Decision Diagnostics admitted in the 2009 10-K, during 2009, ACR earned at least 276,000 as "financing fees," at least 60,000 as a renewal fee, and at least 1,562,241 shares of common stock as "financing fees." (2009 10-K at F-18). At that time, each share of Series E Preferred Stock was convertible into 50 shares of Common Stock. Decision Diagnostics caused all of those shares to be delivered to ACR in New York, New York.

61.     Simultaneously with the execution of the Second Loan Amendment, Decision Diagnostics (then known as InstaCare), as "Issuer," ACR (then known as "Centurion Credit Resources LLC"), as "Lender," and the Escrow Agent, a New York City law firm, as "Escrow Agent," entered into an "Escrow Agreement," dated as of December 4, 2009, and effective as of November 9, 2009 (the "***Original Escrow Agreement***"), which was thereafter amended and restated in an "Amended and Restated Escrow Agreement," as of March 18, 2011 (the "***Escrow Agreement***"), for the delivery by Decision Diagnostics into escrow, and release from escrow, to ACR, in New York, New York, of Common Stock and Preferred Stock earned under the Loan Agreement. Upon information and belief, Decision Diagnostics and/or its counsel sent and caused to be sent emails, faxes, mail, items by courier services and/or drafts and/or the execution copy of the Original Escrow Agreement and the Escrow Agreement to ACR and/or its counsel in New York, New York, in connection with the negotiation and execution of that agreement and the shares (including the Shares) issued and placed into escrow thereunder, and ACR and the Escrow Agent executed those agreements in New York, New York.

62.     By the terms of the Original Escrow Agreement and the Escrow Agreement, shares were to be released by the Escrow Agent (in New York, New York) to ACR (in New York, New York) "as instructed in writing by the Issuer to the Escrow Agent" "when such Shares have been

earned by the Lender" in accordance with the terms of the Loan Agreement, which, as amended pursuant to the Second Loan Amendment, obligated Decision Diagnostics, upon each "Advance," to deliver to ACR shares of both Common Stock and Series E Preferred Stock, described as "Earned" or "Delivered" shares, in accordance with a specified formula. (Second Loan Amendment §§ 9-12).

63.     Later, in the Escrow Agreement, the parties reaffirmed the prior deposit of the 720,000 shares of Series E Preferred Stock, as well as Decision Diagnostics' additional deposit of 1,000 shares of Series B Preferred Stock, into escrow with the Escrow Agent (in New York, New York), and further agreed that "[t]he Escrow Agent shall deliver the Series E Shares to the Lender in such amounts and at such times as instructed in writing by the Issuer to the Escrow Agent … as required under the Loan Agreement when such Shares have been earned by the Lender." (Escrow Agreement ¶¶ 1-2).

64.     Upon information and belief, Decision Diagnostics caused all of those Shares to be held by the Escrow Agent in New York, New York, and thereafter delivered to ACR in New York, New York.

65.     On December 31, 2010, ACR, PT Direct and Decision Diagnostics entered into a letter agreement dated December 31, 2010 modifying an amended and restated note dated December 4, 2009 (the "***December 2010 Letter Agreement***"). Upon information and belief, Decision Diagnostics and/or its counsel sent emails, faxes, mail and/or drafts and/or the execution copy of that agreement to ACR and/or its counsel in New York, New York, in connection with the negotiation and execution of that agreement, and ACR executed that agreement in New York.

66.     In paragraph 4 of the December 2010 Letter Agreement, the parties agreed that "[i]t shall be a condition precedent to the effectiveness of this letter agreement that Pharmtech shall

deliver to [ACR], on or prior to the closing of business on December 31, 2010, a number of shares of Common Stock (as defined in the Loan Agreement) equal to 10,000,000 shares" (the "***Second Note Renewal Shares***," together with the First Note Renewal Shares, collectively, the "***Note Renewal Shares***").  (December 2010 Letter Agreement ¶ 4).  At all times prior to the issuance of the Series E Amendment on dated December 17, 2011, each share of Class E Preferred Stock was convertible into 50 shares of Common Stock, meaning that 10,000,000 shares of Common Stock was convertible to 200,000 Shares of Series E Preferred Stock.  (*See* Ammendment [sic] to Certificate of Designations of Preferences and Rights of Series E Convertible Preferred Stock of InstaCare Corp., a Nevada Corporation, after Shares have been Issued," at ¶ 2(f)(i)(A), dated December 29, 2010, filed with the Nevada Secretary of State on March 4, 2011.)

67.  Decision Diagnostics issued, filed with the SEC, and posted on its website "Form 10-K/A (Amendment No. 2)" for the year ended December 31, 2010 (the "***2010 10-K***").  A copy of the 2010 10-K can be found on EDGAR at https://www.sec.gov/Archives/edgar/data/0001144225/000107878211001480/instacare10ka2123110.htm.  According to the 2010 10-K, ACR earned additional shares in Decision Diagnostics as "financing fees" pursuant to the Loan Agreement during 2010, which were thus distributed from escrow to ACR.  The 2010 10-K states:  "During the year ended December 31, 2010, we issued 254,100 shares of our preferred Series 'E' from the 2009 escrowed stock to [ACR] as financing fees in connection with our line of credit.  We have recorded financing fees in the amount of $107,993 in connection with these issuances."  (2010 10-K at F-20).  Those issuances and distributions were made by the Escrow Agent (located in New York, New York) to ACR (located in New York, New York) pursuant to written instructions issued by Decision Diagnostics and delivered to the Escrow Agent (located in New York, New York).

68.     The 2010 10-K also states:  "During the year ended December 31, 2010, we have authorized the issuance of 45,652 shares of common stock to [ACR] as financing fees in connection with our line of credit.  The fair value of the shares is $14,324 and has been recorded as financing costs."  (2010 10-K at F-20).  Those issuances and distributions were made by the Escrow Agent (located in New York, New York) to ACR (located in New York, New York) pursuant to written instructions issued by Decision Diagnostics and delivered to the Escrow Agent (located in New York, New York).

69.     The 2010 10-K further states:  "In December 2010, we entered into our second 'Amended and Restated Promissory Note' with [ACR].  Pursuant to the amended agreement, we issued 200,000 shares of our Series 'E' preferred stock as a renewal fee.  The fair value of the issuance totaled $400,000 and will be amortized over the renewal period of one-year.  As of December 31, 2010, we have recorded $33,333 in financing fees and have a remaining unamortized balance of $366,667.  In August 2010, we entered into an 'Escrow Agreement' pursuant to the aforementioned 'Amended and Restated Promissory Note' whereby agreeing to issue an additional 200,000 shares of our preferred Series 'E' stock to be held in escrow for the benefit of Centurion as collateral against the aforementioned line of credit."  (2010 10-K at F-20).

70.     Decision Diagnostics also issued, filed with the SEC, and posted on its website a 10-K for the year ended December 31, 2011 (the "***2011 10-K***").  The 2011 10-K is available on the SEC Electronic Data Gathering, Analysis, and Retrieval system at https://www.sec.gov/Archives/edgar/data/0001144225/000107878212001067/f10k123111_10k.htm.  In the 2011 10-K, Decision Diagnostics disclosed:  "[P]ursuant to the terms of the December 2010 Letter [A]greement, we agreed to issue 200,000 shares of our preferred Series 'E' stock as a renewal fee valued at $400,000.  The loan renewal fee is amortized using the straight-line

method over the one-year renewal period.  As of December 31, 2011 and 2010, we have recorded $366,667 and $33,333, respectively in financing expense related to this fee."  (2011 10-K at F-11).

71.    In the 2011 10-K, Decision Diagnostics also disclosed:  "During the year ended December 31, 2011, we issued 189,700 shares of our preferred series 'E' from the 2010 escrowed stock to [ACR] as financing fees in connection with our line of credit.  We have recorded financing fees in the amount of $488,843 in connection with these issuances."  (2011 10-K at F-14).

72.    The 2011 10-K also describes a split of Decision Diagnostics' Common Stock and states:  "During the year ended December 31, 2011, we authorized the issuance of 954 (post-split) shares of common stock to [ACR] as financing fees in connection with our line of credit. The fair value of the shares is $37,175 and was recorded as financing costs."  (2011 10-K at F-14).

73.    Thus, according to Decision Diagnostics' public filings, from 2010 and 2011, ACR earned and received at the instruction of Decision Diagnostics, hundreds of thousands of shares of Series E Preferred Stock, as well as pre-and post-split shares of Common Stock in accordance with the agreements between the parties.  (*E.g.*, 2010 10-K at F-20; 2011 10-K at F-14).

C.    **The Third Loan Amendment and the Shares Delivered Thereunder and Under Prior Agreements**

74.    PT Direct, Decision Diagnostics and ACR thereafter entered into a "Third Omnibus Loan Document Modification and Reaffirmation Agreement," dated March 2, 2012 (the "***Third Loan Amendment***").  Upon information and belief, Decision Diagnostics and/or its counsel sent and caused to be sent and caused to be sent emails, faxes, mail, items by courier services and/or drafts and/or the execution copy of that agreement to ACR and/or its counsel in New York, New

York, in connection with the negotiation and execution of, and shares issued under, that agreement, and ACR executed that agreement in New York, New York.

75. In Section 2 of the Third Loan Amendment, the parties agreed that ACR would have a "Conversion Option," namely, "the right . . . at any time from time to time, on written notice to Borrower and Decision Diagnostics, to convert any sums then due and owing to Lender" into Common Stock or Preferred Stock held pursuant to the Escrow Agreement in accordance with a formula set forth therein. The Third Loan Amendment nevertheless provides that Decision Diagnostics shall not effect a conversion, and ACR shall not have the right of conversion, under the Conversion Option in the event that ACR and its affiliates would own in excess of 4.99% of Decision Diagnostics' Common Stock after exercising the Conversion Option, but that ACR can waive such limitation upon 61 days' prior written notice. (Third Loan Amendment § 2).

76. The Third Loan Amendment further provides that, in the event of a Conversion Option exercise, "Decision Diagnostics shall cause its counsel, which counsel shall be reasonably acceptable to Lender, to issue an opinion of counsel to and for the benefit of Lender that such Converted Shares are freely tradable by Lender on and as of the date of issuance to Lender" and "the Company hereby irrevocably authorizes the Company's transfer agent, as such entity may then be serving as the transfer agent for the Company's Common Stock from time to time, to accept opinion of counsel for purposes of Rule 144 from the law firm Tarter Krinsky & Drogin LLP or such other counsel as Lender may designate that is reasonably acceptable to the Company." (Third Loan Amendment § 2).

77. The Third Loan Amendment also provides:

The parties acknowledge that, as of the Effective Date, the outstanding principal balance of the Loan is $2,100,000.00. In addition, simultaneously with the execution and delivery of this Agreement, Decision Diagnostics shall issue to

Lender 124,700 Series E Shares and 238 shares of Common Stock, which are issued to Lender in payment of all accrued and unpaid interest through the Effective Date.

(Third Loan Amendment § 3).

78.    Decision Diagnostics issued and filed with the SEC a 10-K for the year ended December 31, 2012 (the "***2012 10-K***").  A copy of the 2012 10-K can be found on EDGAR at https://www.sec.gov/Archives/edgar/data/0001144225/000107878213000764/f10k123112_10k.htm.

79.    The 2012 10-K states:  "During the year ended December 31, 2012, the Company authorized the release of 124,700 shares of our preferred Series 'E' stock to Alpha Credit Resources for accrued interest totaling $80,482."  The 2012 10-K further states:  "During the year ended December 31, 2012 the Company issued 238 shares of common stock to Alpha Credit Resources as financing fees in connection with our line of credit.  The fair value of the shares was $36, and was recorded as financing costs." (2012 10-K at F-13).

80.    Consequently, as Decision Diagnostics has admitted in its own public SEC filings, during the calendar year 2012 ACR earned*,* and therefore received from escrow (in New York, New York), at the instruction of Decision Diagnostics to the Escrow Agent (in New York, New York), a total of at least 124,700 Series E Preferred Shares and 238 Shares of Common Stock in 2012.  The 238 shares of Common Stock are represented by certificate number 14101 issued by Decision Diagnostics to ACR.

81.    Upon information and belief, at the direction of Decision Diagnostics, on or about November 27, 2013, Certificate Nos. 1330, 1331 and 1332, for 70,000, 70,000 and 60,000 Series E Preferred Shares, respectively (collectively, the "***November 27, 2013 Certificates***") were issued in the name of ACR and delivered to ACR in New York, New York.  In an email from Joel Edelstein of ACR to Chaim Englander ("***Englander***") of ACR's broker, Darbie, attaching those

Certificates following their issuance and delivery to ACR, Edelstein wrote: "I am sending you the attached certs – it's the 200k shares broken down."

82.    Upon information and belief, the November 27, 2013 Certificates were reissued to replace one or more certificates for a total of 200,000 Shares of Series E Preferred Stock earned by ACR, in exchange for (a) the extension of credit by ACR and/or (b) the renewal of the line of credit and/or notes thereunder and/or (c) the waiver of debt or accrued interest or conversion of debt into equity.

83.    Upon information and belief, ACR earned each of the following Shares (or predecessors of those Shares) prior to December 1, 2013 under the Original Loan Agreement, the First Loan Amendment, the Note Renewal Agreement, the December 2010 Letter Agreement, the Second Loan Amendment and/or the Third Loan Amendment pursuant to the Loan Agreement, as financing fees in exchange for the extension of credit and/or as renewal of debt and/or in exchange for the forgiveness of debt:

| **Common Shares** | | | |
|---|---|---|---|
| **Certificate #** | **Series** | **Issue Date** | **# of Shares** |
| 13205 | Common | 12/30/2011 | 39 |
| 13209 | Common | 12/30/2011 | 149 |
| 13572 | Common | 1/24/2012 | 1,228 |
| 14025 | Common | 2/11/2012 | 68 |
| 14026 | Common | 2/11/2012 | 306 |
| 14027 | Common | 2/11/2012 | 268 |
| 14101 | Common | 3/30/2012 | 238 |
| | | | **2,296** |

| **Series E Preferred Shares** | | | |
|---|---|---|---|
| **Convertible 1:14** | | | |
| **Certificate #** | **Series** | **Issue Date** | **# of Shares** |
| 1190 | Series E | 1/7/2011 | 100 |
| 1136 | Series E | 12/10/2009 | 500 |
| 1149 | Series E | 12/10/2009 | 500 |
| 1331 | Series E | 11/27/2013 | 70,000 |

| 1330 | Series E | 11/27/2013 | 70,000 |
| 1332 | Series E | 11/27/2013 | 60,000 |
| | | | **201,100** |

## D. The Fourth Loan Amendment

84.     On or about December 6, 2013, PT Direct, Decision Diagnostics and ACR entered into a "Fourth Omnibus Loan Document Modification and Reaffirmation Agreement," dated December 6, 2013 (the "***Fourth Loan Amendment***").  Upon information and belief, Decision Diagnostics and/or its counsel sent and caused to be sent and caused to be sent emails, faxes, mail, items by courier services and/or drafts and/or the execution copy of that agreement to ACR and/or its counsel in New York, New York, in connection with the negotiation and execution of, and shares issued under, that agreement, and ACR executed that agreement in New York, New York. Berman, for Decision Diagnostics, travelled to New York, New York, and met with representatives of ACR and PPCO Master at least twice in New York, New York, in connection with the negotiation of the terms of the Fourth Loan Amendment.

85.     In the Fourth Loan Amendment, the parties amended the Loan Agreement for the final time – this time to increase the principal limit on the line of credit to $12,500,000, the outstanding amount of which would mature, and become due and payable, on December 31, 2015. In Section 26 of the Fourth Loan Amendment, Decision Diagnostics "join[ed] into each of the Loan Documents as 'Borrower,' together with [PT Direct] on a joint and several basis."

86.     The Fourth Loan Amendment was structured like a payoff of the then existing line of credit, and the extension of a new, larger line of credit.  In Section 24 of the Fourth Loan Amendment, ACR expressly exercised its "Conversion Option" granted in the Third Loan Amendment.  In this regard, the Fourth Loan Amendment provides that, "[i]n furtherance of this exercise by Lender of the Conversion Option, … Decision Diagnostics hereby authorizes the

Escrow Agent to deliver to [ACR] (a) 1,000 Series B Shares … (and Decision Diagnostics represents and warrants to [ACR] that its Series B Shares are and shall each be convertible into 15,000 shares of common stock of Decision Diagnostics), and (b) 214,290 Series E Shares (and Decision Diagnostics represents and warrants to [ACR] that its Series E Shares are and shall each be convertible into 14 shares of common stock of Decision Diagnostics) . . . ," in return for which "all sums due and owing to Lender under the Note immediately prior to the date of this [Fourth Loan Amendment], including, but not limited to all principal, accrued interest and penalties, shall be deemed reduced to $0.00."

87.     In addition, in consideration for the new, expanded line of credit, in Sections 2(d) and 2(e) of the Fourth Loan Amendment, respectively, the parties agreed that, on the date of the Fourth Loan Amendment (the "***Commitment Fee Shares***") and again on the first anniversary of the date of that agreement one year later (the "***Second Year Commitment Fee Shares***"), Decision Diagnostics would cause the Escrow Agent to issue to ACR 67,860 shares of Series E Preferred Stock, each such share being convertible into 14 shares of Common Stock. Section 2(e) of the Fourth Loan Amendment also states that "[s]uch Series E Shares are fully earned by Lender on the date of this Agreement . . . ."

88.     With respect to all shares issued to ACR, the Fourth Loan Amendment provides, in Section 2(j):

> Throughout the term of the Loan, from time to time, and as requested by Lender or its representatives, Decision Diagnostics shall, from time to time, assist Lender in converting portions of its Series E Preferred Shares and Series B Preferred shares, and shall use its best efforts to effectuate any such conversion within ten (10) Business Days (including, without limitation, causing the issuance of such opinions of counsel and the adoption of such authorizing resolutions as Lender may require). Decision Diagnostics's failure to so assist Lender in such conversion for a period of five (5) Business Days following notice of such failure from Lender to

Borrower shall constitute an Event of Default hereunder. Lender agrees that at no time during the pendency of this Agreement shall it own or control more than 4.99% of the outstanding common stock of Decision Diagnostics.

89. The Fourth Loan Amendment further provides, in Section 9:

*In connection with any and all preferred shares of Decision Diagnostics* either held outright by Lender, or held by the Escrow Agent pursuant to the Escrow Agreement, whether on, prior to, or subsequent to the date hereof, Decision Diagnostics *shall* deliver to the Transfer Agent one or more resolutions of Decision Diagnostics's board of directors, which resolutions *shall* direct the Transfer Agent to convert any such preferred shares into Common Stock at the request of Lender, or the Transfer Agent, or Lender's stock depository or custodian. [Emphasis added].

**E. The Shares Earned by ACR under the Fourth Loan Amendment as Consideration for Its Conversion of $3,031,150.50 of Outstanding Debt and Its Execution of that Agreement**

90. Upon information and belief, between December 11 and 16, 2013, at the request of Decision Diagnostics, the Escrow Agent delivered to ACR certificates for certain shares earned by ACR, including, among others, certificates for 1,000 shares of unregistered Series B Preferred Stock (deliverable under Section 24 of the Fourth Loan Amendment as a portion of the consideration from Decision Diagnostics for ACR's conversion of principal and interest thereunder) and 282,150 shares of unregistered Series E Preferred Stock (representing (a) the 214,290 shares of Series E Preferred Stock earned by ACR under Section 24 of the Fourth Loan Amendment as part of the consideration for ACR's conversion of principal and interest under that provision, and (b) the 67,860 shares of Series E Preferred Stock earned by ACR under Section 2(d) upon, and as consideration for, ACR entering into the Fourth Loan Amendment) (collectively, the "*December 2013 Shares*"). The December 2013 Shares include the following shares:

| Shares of Series E Preferred Stock (1 Share of Series E Preferred Stock is Convertible into 14 Shares Common Stock.) | | | | | | |
|---|---|---|---|---|---|---|
| Certificate Number | Series | Issue Date | Number of Shares | Conversion Rate into Common Stock | Equivalent in Shares of Common Stock If Converted | Purpose |
| 1333 | Series E | 12/10/2013 | 35,714 | 1:14 | 499,996 | Six of these seven certificates and six shares of the seventh certificate (totaling 214,290 Series E shares) were issued and delivered to ACR as part of the consideration for its conversion of all outstanding debt. (Fourth Loan Amendment §24). The remaining 35,708 shares of the seventh certificate are part of the Commitment Fee Shares, issued as consideration for ACR entering into the Fourth Loan Amendment. (Fourth Loan Amendment §2(d)). |
| 1334 | Series E | 12/10/2013 | 35,714 | 1:14 | 499,996 | |
| 1335 | Series E | 12/10/2013 | 35,714 | 1:14 | 499,996 | |
| 1336 | Series E | 12/10/2013 | 35,714 | 1:14 | 499,996 | |
| 1337 | Series E | 12/10/2013 | 35,714 | 1:14 | 499,996 | |
| 1338 | Series E | 12/10/2013 | 35,714 | 1:14 | 499,996 | |
| 1339 | Series E | 12/10/2013 | 35,714 | 1:14 | 499,996 | |
| 1341 | Series E | 12/10/2013 | 32,152 | 1:14 | 450,128 | This certificate represents the rest of the 67,860 shares representing the Commitment Fee |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | Shares. (Fourth Loan Amendment §2(d)). |
| Total | Series E | 12/10/2013 | 282,150 | 1:14 | 3,950,100 | |

| **Shares of Series B Preferred Stock** | | | | | | |
|---|---|---|---|---|---|---|
| **(1 Share of Series B Preferred Stock is Convertible into 15,000 Shares Common Stock.)** | | | | | | |
| **Certificate Number** | **Series** | **Issue Date** | **Number of Shares** | **Conversion Ratio into Common Stock** | **Equivalent in Shares of Common Stock If Converted** | |
| 1011 | Series B | 12/10/2013 | 33 | 1:15,000 | 495,000 | All of these certificates were issued and delivered to ACR as part of the consideration for its conversion of all outstanding debt. (Fourth Loan Amendment §24). |
| 1012 | Series B | 12/10/2013 | 33 | 1:15,000 | 495,000 | |
| 1013 | Series B | 12/10/2013 | 33 | 1:15,000 | 495,000 | |
| 1014 | Series B | 12/10/2013 | 33 | 1:15,000 | 495,000 | |
| 1015 | Series B | 12/10/2013 | 33 | 1:15,000 | 495,000 | |
| 1016 | Series B | 12/10/2013 | 33 | 1:15,000 | 495,000 | |
| 1017 | Series B | 12/10/2013 | 33 | 1:15,000 | 495,000 | |
| 1018 | Series B | 12/10/2013 | 33 | 1:15,000 | 495,000 | |
| 1019 | Series B | 12/10/2013 | 33 | 1:15,000 | 495,000 | |
| 1020 | Series B | 12/10/2013 | 33 | 1:15,000 | 495,000 | |
| 1021 | Series B | 12/10/2013 | 33 | 1:15,000 | 495,000 | |
| 1022 | Series B | 12/10/2013 | 33 | 1:15,000 | 495,000 | |
| 1023 | Series B | 12/10/2013 | 33 | 1:15,000 | 495,000 | |
| 1024 | Series B | 12/10/2013 | 33 | 1:15,000 | 495,000 | |
| 1025 | Series B | 12/10/2013 | 33 | 1:15,000 | 495,000 | |
| 1026 | Series B | 12/10/2013 | 33 | 1:15,000 | 495,000 | |
| 1027 | Series B | 12/10/2013 | 33 | 1:15,000 | 495,000 | |
| 1028 | Series B | 12/10/2013 | 33 | 1:15,000 | 495,000 | |
| 1029 | Series B | 12/10/2013 | 33 | 1:15,000 | 495,000 | |
| 1030 | Series B | 12/10/2013 | 33 | 1:15,000 | 495,000 | |
| 1031 | Series B | 12/10/2013 | 33 | 1:15,000 | 495,000 | |
| 1032 | Series B | 12/10/2013 | 33 | 1:15,000 | 495,000 | |
| 1033 | Series B | 12/10/2013 | 33 | 1:15,000 | 495,000 | |
| 1034 | Series B | 12/10/2013 | 33 | 1:15,000 | 495,000 | |
| 1035 | Series B | 12/10/2013 | 33 | 1:15,000 | 495,000 | |
| 1036 | Series B | 12/10/2013 | 33 | 1:15,000 | 495,000 | |
| 1037 | Series B | 12/10/2013 | 33 | 1:15,000 | 495,000 | |
| 1038 | Series B | 12/10/2013 | 33 | 1:15,000 | 495,000 | |
| 1039 | Series B | 12/10/2013 | 33 | 1:15,000 | 495,000 | |
| 1040 | Series B | 12/10/2013 | 33 | 1:15,000 | 495,000 | |
| 1041 | Series B | 12/10/2013 | 10 | 1:15,000 | 150,000 | |
| Total | Series B | 12/10/2013 | 1,000 | 1:15,000 | 15,000,000 | |

91.     On December 10, 2014, at the direction of Decision Diagnostics, James G. Smith, Esq., of the Escrow Agent, sent a letter via messenger to Brian Jedwab ("**Jedwab**"), who until 2016 was "Portfolio Manager" of ACR, enclosing certificate number 1340, for 35,714 shares of unregistered Series E Preferred Stock, and certificate number 1342, for 32,146 shares of unregistered Series E Preferred Stock – a total of 67,860 shares of unregistered Series E Preferred Stock, representing the Second Year Commitment Fee Shares, issued by Decision Diagnostics under Section 2(e) of the Fourth Loan Amendment, in consideration for ACR entering into the Fourth Loan Amendment (collectively, the "**December 10, 2014 Smith Letter**").  Under Section 2(e) of the Fourth Loan Amendment, these Shares were "fully earned" by ACR when it entered into the Fourth Loan Amendment.

92.     In November 2014, Berman, on behalf of Decision Diagnostics, and Jedwab, for ACR, both executed a letter dated November 10, 2014, in connection with a then ongoing (but never completed) audit of Decision Diagnostics' 2013 financial statements (the "**November 10, 2014 Letter**").  In the November 10, 2014 Letter, Decision Diagnostics admitted that **both** the 1,000 shares of Series B Preferred Stock **and** the 214,290 shares of Series E Preferred Stock referred to in Section 24 of the Fourth Loan Amendment were **earned** by and **delivered** to ACR in satisfaction of the Loan, which Decision Diagnostics admitted had an outstanding balance of $3,031,150.50 as of December 6, 2013.  Berman, on behalf of Decision Diagnostics, further admitted in the November 10, 2014 Letter that an additional 135,720 shares of Series E Preferred Stock (in two transfers of 67,860 shares, the first on the date of closing and the second a year later) were "fully earned" upon execution of the Fourth Loan Amendment.

93.     Specifically, the November 10, 2014 Letter states, in part:

> Terms of pay-off:  **The total principal and interest of $3,031,150.50 was paid-off in the form of 1,000 shares of Series B Preferred**

> *Stock (convertible into 15,000,000 shares of common stock) and 214,290 shares of Convertible Preferred Series E Stock (convertible into 3,000,060 shares of common stock). . . .*
>
> \* \* \* \*
>
> Equity participation:  At the closing of the line, and on each (1) year anniversary thereof up to and including the maturity date, the Borrower shall issue to Lender 67,860 shares of Convertible Preferred E stock of Borrower (such Preferred E shares being convertible into 950,040 shares of common stock of Borrower). Such shares for the first two (2) years of the term of the line shall be ***deemed fully earned by Lender at Closing***.  [Underlining omitted, emphasis added.]

94.     Decision Diagnostics also issued and filed with the SEC "Unaudited Financial Statements for the Years Ended December 31, 2013 and 2012" (the "***2013/2012 Financial Statements***").  Consistently with the November 10, 2014 Letter, in its discussion of Series B Preferred Stock in the 2013/2012 Financial Statements, Decision Diagnostics admitted:  "During the year ended December 31, 2013, the Company issued 1,000 shares of preferred series 'B' to satisfy all debt and accrued interest payable to [ACR] totaling $3,031,151."

95.     Decision Diagnostics issued and filed with the SEC financial statements entitled "Decision Diagnostics Corp. Quarterly Reporting for OTC Pink Management's Discussion & Analysis Quarterly Report for the Period Extended March 31, 2016" (the "***March 31, 2016 Management Discussion***").  According to Decision Diagnostics' own admissions in the March 31, 2016 Management Discussion, which was the first quarterly financial report it submitted after the expiration of the Fourth Loan Amendment:  "In December 2013 we again renewed our credit line with Alpha Credit, expanding our credit line to $12.5 million (Fourth Omnibus Renewal). ***As a part of the most recent renewal agreement all previous accrued debt and interest owed Alpha Credit was reduced to $0.00***.  This agreement came to term on December 13 [sic], 2015 without any borrowings having occurred."  (Emphasis added).

96.     The certificate numbers of the December 2013 Shares and the Second Year Commitment Fee Shares are indisputable.  By email dated December 16, 2013, from Joel Edelstein ("**Edelstein**"), on behalf of ACR, to Chaim Englander ("**Englander**") of ACR's broker, Darbie, Edelstein forwarded to Englander copies of the certificates for the December 2013 Shares, and stated that the "1,000 series B and 282,150 series E [*i.e.*, the December 2013 Shares] were received as part of the attached [Fourth Loan Amendment]."  In addition, the December 10, 2014 Smith Letter enclosed certificate numbers 1340 and 1342 and identified them as the Second Year Commitment Fee Shares.

97.     The following Shares are currently held by the Receiver (collectively defined in paragraph 1 and footnote 1 above as the "Certificates" and the "Shares"):

- all 1,000 shares of Series B Preferred Stock which ACR earned pursuant to Section 24 of the Fourth Loan Amendment, represented by certificate numbers 1011-1041;

- the remaining (unsold) 246,430 shares of Series E Preferred Stock earned by ACR pursuant to Sections 24, 2(d) and 2(e) of the Fourth Loan Amendments, represented by certificate numbers 1335-1340 and 1342 (*i.e.*, the December 2013 Shares);

- 201,110 shares of Series E Preferred Stock, all of which ACR earned prior to December 1, 2013, represented by certificate numbers 1330 and 1331, each for 70,000 shares of Series E Preferred Stock, certificate number 1332, for 60,000 shares of Series E Preferred Stock, certificate number 1190, for 100 shares of Series E Preferred Stock, certificates 1136 and 1149, each for 500 shares of Series E Preferred Stock, and certificate 1366, for 10 shares of Series E Preferred Stock; and

- the Common Shares, represented by certificate number 13205, for 39 shares of Common Stock, certificate number 13209, for 149 shares of Common Stock, certificate number

13572, for 1228 shares of Common Stock, certificate number 14025, for 68 shares of Common Stock, certificate number 14026, for 306 shares of Common Stock, certificate number 14027, for 268 shares of Common Stock, and certificate number 14101, for 238 shares of Common Stock, all of which ACR earned before December 1, 2013.

98.    All of the Shares are within the Receiver's control pursuant to the terms of the Receivership Order.  At all times since early July 2021, all but two of the Certificates have been held in a safe at Otterbourg P.C., which is under the Receiver's control.  The other two Certificates (which bear certificate numbers 13205 and 13209) are held at a separate office under the Receiver's control located at 230 Park Avenue, New York, New York 10169.  The Receiver holds all of the Shares on behalf of ACR.

99.    Each of the Certificates bears a restrictive legend indicating that the Shares it represents have not been registered under the Securities Act of 1933.  These legends, and the fact that each of the Preferred Shares is preferred stock for which there is no ready market, are preventing the Receiver from selling them.

100.    Prior to the filing of the original Complaint, an attorney designated by ACR who is lawfully authorized to give Rule 144 opinions rendered an opinion that all of the Shares (other than the Shares represented by the Certificates bearing certificate numbers 13205 and 13209, which were discovered after that opinion was issued) fall within the "safe harbor" of SEC Rule 144 and, therefore, are exempt from Rule 144's re-sale restrictions (the "***Rule 144 Opinion***").  In paragraph 75 of the original Complaint in this action, filed on February 18, 2021, and served upon Decision Diagnostics on February 25, 2021, the Receiver advised Decision Diagnostics of the issuance of the Rule 144 Opinion.

101.   Upon information and belief, the Original Loan Amendment, the Second Loan Amendment, the Third Loan Amendment and the Fourth Loan Amendment were all authorized by Decision Diagnostics' board of directors.  In this regard, Berman, as at least an officer of Decision Diagnostics, executed each of those agreements on behalf of Decision Diagnostics.  Moreover, according to Decision Diagnostics' financial statements, Berman was also, at all relevant times, a director of Decision Diagnostics.  In addition, in Section 3.6 of the Original Loan Agreement, which is incorporated into, among other agreements, the Second Loan Amendment, the Third Loan Amendment and the Fourth Loan Amendment, Decision Diagnostics represented that "[t]he execution, delivery and performance of the Loan Documents have been duly authorized by all necessary corporate action and each represents a legal, valid and binding obligation of the Borrower and is fully enforceable according to its terms, except as limited by laws relating to the enforcement of creditors' rights."  Further, Decision Diagnostics accepted the consideration for the Shares.

102.   Consequently, ACR issued the Shares in exchange for the "consideration … fixed … by the Board of Directors," as referred to in the Articles of Incorporation, and Decision Diagnostics received the "consideration for which its board of directors authorized the issuance of [the] [S]hares," as referred to in NRS § 78.211(2).  Accordingly, ACR earned and owns each of the Shares.

## II.   The Receivership and the Criminal Action

### A.   The Commencement of the Receivership Action

103.   On December 19, 2016, the SEC commenced the Receivership Action under the federal securities laws against Mark Nordlicht ("***Nordlicht***"), David Levy ("***Levy***"), Daniel Small ("***Small***"), Uri Landesman ("***Landesman***") (now deceased), Joseph Mann ("***Mann***"), Joseph SanFilippo ("***SanFilippo***"), and Jeffrey Shulse ("***Shulse***," together with Nordlicht, Levy, Small,

Landesman, Mann and San Filippo, collectively, the "***Platinum Insiders***"), who managed three separate but affiliated groups of hedge funds operating under the name "Platinum Partners" – the "Platinum Partners Credit Opportunities" funds ("***PPCO***"); the "Platinum Partners Value Arbitrage" funds ("***PPVA***"); and the "Platinum Partners Liquid Opportunity" funds – and against two entities that served as the portfolio managers of PPCO and PPVA.  (ECF No. 1).

104.    Contemporaneously with its commencement of the Receivership Action, the SEC sought and obtained a court-ordered receivership over the Original Receivership Entities, all of which were placed under the control of the Prior Receiver pursuant to the terms of the original Receivership Order (the "***Original Receivership Order***").  (ECF Nos. 1-2 to 1-81 & 6).

### B.    The Criminal Action

105.    On December 19, 2016, the Court, at the request of the Government, unsealed an indictment of the Platinum Insiders (the "***Indictment***") in the United States District Court for the Eastern District of New York.  (*U.S. v. Nordlicht, et al.*, 16-cr-640-BMC (E.D.N.Y.), Dkt. Nos. 1, 3 (the "***Criminal Action***")).  The Indictment charged the Platinum Insiders with engaging in one or both of two fraudulent schemes:  the "***Fraudulent Investment Scheme***" and the "***Black Elk Bond Scheme***."  (*Id.*)  In the Fraudulent Investment Scheme, Nordlicht, Levy, Landesman, SanFilippo and Mann allegedly "engaged in a scheme to defraud investors and prospective investors in Platinum through material misrepresentations and omissions relating to, among other things:  (i) the performance of some of PPVA's Level 3 assets; (ii) PPVA's liquidity; (iii) the purpose of PPNE [Platinum Partners Northstar Equity, a PPVA entity] …; (iv) PPVA's preferential redemption process; and (v) related party transactions involving PPVA and PPCO." (Criminal Action, Dkt. No. 1, ¶¶ 42-72).  In the Black Elk Bond Scheme, Nordlicht, Levy, Small and Shulse allegedly "engaged in a scheme to defraud third-party holders of [Black Elk] bonds

(the 'Bondholders') and to deprive the Bondholders of the proceeds of the sale of Black Elk's most lucrative assets." (Criminal Dkt. No. 1, ¶¶ 73-87).

106.   None of the Government's allegations in, or of the evidence or argument at the trial of, the Criminal Action, which the Receiver's team monitored, referred or related to ACR or Decision Diagnostics. (Criminal Action, Dkt. No. 1).

107.   On July 9, 2019, the jury returned verdicts of Not Guilty on all Fraudulent Investment Scheme counts and Guilty on all Black Elk Bond Scheme counts (against Nordlicht and Levy), the other charges against the defendants having been dismissed. (Criminal Action Min. Entry 7/9/19; Dkt. #752). In the Criminal Action, this Court denied Nordlicht's motion for acquittal, granted Levy's motion for acquittal, and granted Nordlicht's motion for a new trial (the "**Criminal Action Decision**"). (*Id*. Dkt. #799).

108.   On November 5, 2021, the Second Circuit reversed the Criminal Action Decision. *United States v. Levy*, 19-3207-CR, 19-3209-CR (2d Cir. Nov. 5, 2021), Dkt. No. 138 (the "**Second Circuit Decision**").

## C.    The Prohibitions in the Receivership Order

109.   Both the Receivership Order and the Original Receivership Order prohibit "[t]he Receivership Entities and all persons receiving notice of this Order …" ("**Notice Parties**") from "directly or indirectly taking any action or causing any action to be taken, without the express agreement of the Receiver" that would:

   (a)    "[i]nterfere with the Receiver's efforts to take control, possession, or management of any Receivership Property…," including but not limited to "using self-help" or "other process for the purpose of impounding or taking possession of or interfering with … any Receivership Property";

   (b)    "[h]inder, obstruct or otherwise interfere with the Receiver in the performance of the Receiver's duties…," including but not limited to "concealing … records or information";

(c)     "[d]issipate or otherwise diminish the value of any Receivership Property," including but not limited to by "releasing claims or disposing, transferring, exchanging, assigning or in any way conveying any Receivership Property, enforcing … claims against any Receivership Property or any Receivership Entities" or "attempting to modify, cancel, call, extinguish [or] revoke … any … loan,… indebtedness, security agreement or other agreement … which … affects any Receivership Property"; or

(d)     "[i]nterfere with or harass the Receiver, or interfere in any manner with the exclusive jurisdiction of this Court over the Receivership Estate."

(Receivership Order, ¶¶ 22(A)-(D); Original Receivership Order ¶¶ 23(A)-(D)).

110.    Both the Receivership Order and the Original Receivership Order further provide that:

- "[a]ll persons and entities having control, custody or possession of any Receivership Property are hereby directed to turn such property over to the Receiver" (Receivership Order ¶ 10; Original Receivership Order ¶ 11);

- all Notice Parties "having possession of the property, business, books, records, accounts or assets of the Receivership Entities are hereby directed to deliver the same to the Receiver, the Receiver's agents and/or employees" (Receivership Order, ¶ 11; Original Receivership Order ¶ 12); and

- "[a]ll … persons or entities which have possession, custody or control of any assets or funds held by, in the name of, or for the benefit of, directly or indirectly, … the Receivership Entities that receive actual notice of [the Receivership] Order … shall … [n]ot exercise any form of set-off, alleged set-off, lien, or any form of self-help whatsoever, or refuse to transfer any funds or assets to the Receiver's control without the permission of this Court; and [shall] … [c]ooperate expeditiously in providing information and transferring funds, assets and accounts to the Receiver or at the direction of the Receiver." (Receivership Order, ¶ 12; Original Receivership Order ¶ 13).

111.    In an action filed in the United States District Court for the Southern District of New York (the "**SDNY Court**"), entitled *Cyganowski v. Beechwood Re Ltd.*, No. 18-12018-JSR (S.D.N.Y.), which the Receiver commenced as receiver, the SDNY Court ruled that, under the Receivership Order, the assets of PPCO Master's "majority owned" subsidiaries are "Receivership Property." The SDNY Court explained:

> Pursuant to the Receivership Order, the Receiver has the "right to sue for and collect … from third parties all Receivership Property," which includes the guarantee interests granted by the PPCO Subsidiaries…. This is because "[e]ach of the [PPCO Subsidiaries] is majority owned by PPCO Master …, with ultimate corporate authority belonging to PPCO Master…," and the "Receivership Property" is defined as "all property interests of the Receivership Entities, including, but not limited to, monies … claims, rights and other assets, together with all … other income attributable thereto, of whatever kind, which the Receivership Entities own, possess, have a beneficial interest in, or control directly or indirectly."

*In re Platinum-Beechwood Litig.*, 427 F. Supp. 3d 395, 455 (S.D.N.Y. 2019).

112.   As demonstrated above, ACR earned the Shares and therefore owns them.  Thus, like the "guaranty interests granted by the PPCO Subsidiaries" (including ACR) to PPCO Master's secured lenders, the Shares are "Receivership Property" under the Receivership Order.

###    D.   **Decision Diagnostics' Repeated Receipt of Notice of the Receivership Order and the Original Receivership Order**

113.   Since at least May 17, 2017, Decision Diagnostics and Berman have been on actual notice of the provisions of the Receivership Order.

114.   On May 17, 2017, Brent Weisenberg, Esq. ("*Weisenberg*"), then general counsel of the Original Receivership Entities, emailed a copy of the Original Receivership Order to Berman.

115.   On May 18, 2017, Weisenberg sent a copy of the Original Receivership Order to Decision Diagnostics' then outside attorney, Jeff Quick, Esq.

116.   On May 22, 2019, Weisenberg emailed a letter enclosing a copy of the Receivership Order to Berman (that letter together with the enclosures thereto, the "*Weisenberg Letter*").

117.   On June 25, 2020, William M. Moran, Esq., of Otterbourg P.C., sent a copy of the Receivership Order to Ronald S. Herzog, Esq. ("*Herzog*"), Decision Diagnostics' attorney (the "*June 25, 2020 Demand Letter*").

**III.** **Decision Diagnostics' Baseless Purported Cancellation of the Shares and the Subsequent Communications between Representatives of the Receiver and Decision Diagnostics**

118.     Decision Diagnostics issued and filed with the SEC an "Annual Report for OTC Pink Supplemental Disclosures Annual Report for the Period Ended December 31, 2018."  In it, Decision Diagnostics announced that "in 1Q 2018 [it] decided to cancel 1,000 Series B Preferred shares that Alpha did not earn and may have been part of a scheme to defraud the company."

119.     In its Quarterly Report for OTC Pink Management's Discussion & Analysis for the Quarter Ended March 31, 2019, Decision Diagnostics stated that "in 1Q 2018 we decided to cancel 1,000 Series B Preferred shares that Alpha did not earn, and over 300,000 shares of Preferred E stock that was not earned, and may have been a part of a scheme to defraud the company as principals of Alpha's parent are now on trial, in sentencing proceedings, or both." Decision Diagnostics made the same statement in its Quarterly Report for OTC Pink Supplemental Disclosures for the Three Months Ended September 30, 2020 (the "***Third Quarter 2020 Supplemental Disclosures***").

120.     Upon becoming aware of Decision Diagnostics' statements regarding its baseless, purported cancellation of the Shares, the Receiver took action.

121.     On May 22, 2019, Weisenberg, on behalf of the Receiver, as agent on behalf of ACR, emailed the Weisenberg Letter to Berman, asserting that "DECN has no legal right to unilaterally confiscate or 'cancel' property validly owned by ACR, including the shares described above, all of which were fully earned, paid and nonassessable" and demanded that Decision Diagnostics:  (a) convert ACR's 1,000 shares of Series B Preferred Stock into 15,000,000 shares of Common Stock, (b) convert all 447,540 shares of Series E Preferred Stock held by ACR (including the 246,430 Series E Preferred Shares that are part of the December 2013 Shares) into Common Stock, and (c) remove any transfer restrictions on the Shares.

122. By e-mail dated July 3, 2019, Herzog stated that he had been retained as Decision Diagnostics' counsel and that: "I will respond to you once our investigation into this matter is concluded." Various correspondence and email communications ensued between Weisenberg and Herzog, but, upon information and belief, Herzog never concluded his "investigation."

123. Beginning on April 30, 2020, Trey Rogers, CPA ("***Rogers***"), the CFO of the Receivership Entities, attempted to obtain information by email from the Transfer Agent regarding the number of shares owned by ACR, but Herzog and the Transfer Agent thwarted those attempts. Upon receiving Rogers' email, the Transfer Agent initially stalled by making serial requests for information regarding Rogers' authority to receive such information. Yet, even after all of the requested evidence of authority was provided, the Transfer Agent never provided the requested information to ACR.

124. Instead, by email dated May 26, 2020, Herzog intervened and requested that Rogers "[p]lease direct all further correspondence regarding this matter to me," complained that copies of the Certificates had not been delivered to him, and then proceeded to argue that, "[a]ssuming proof of ownership by production of the stock certificates, any attempt by the Receiver to exercise control of certain common and preferred stock would still fail" because the Shares were "never earned." Neither the Transfer Agent nor Decision Diagnostics ever provided the information requested by Rogers.

125. The Receiver, by counsel, issued one final demand letter – the June 25, 2020 Demand Letter. The documents attached thereto included the fronts and back of the Certificates for the Shares.

126. Herzog never provided a substantive response to the June 25, 2020 Demand Letter.

## IV.    Recent Events and the Harm to the Receivership Estate

127.    Prior to the unsealing of the Berman Indictment and the commencement of the Decision Diagnostics Enforcement Proceeding on December 17, 2020, in the Third Quarter 2020 Supplemental Disclosures, Decision Diagnostics stated that "[a]t September 30, 2020, we had cash and cash equivalents of $615,500 and negative working capital of $3,545,710," and "[o]ur plan for satisfying our cash requirements for the next twelve months is through additional equity, third party financing, and/or debt financing."

128.    On January 15, 2021, a putative class action entitled *Sanchez v. Decision Diagnostics Corp.*, No. 21-cv-00418-JAK-JPR (E.D. Cal.), was commenced against Decision Diagnostics and Berman in the United States District Court for the Central District of California. With Decision Diagnostics' current market capitalization at, upon information and belief, approximately $2.55 million, this class action has the potential to result in substantial damages.

129.    Decision Diagnostics' stock closed at 0.018 per share on February 17, 2021 – a fraction of its closing price of $.435 per share on August 5, 2020 – and thereafter continued to decline.

130.    There is no reasonable prospect that a company, the stock of which is trading for almost nothing, that was "experiencing a substantial 'cash crunch'" even ***before*** it was named as a defendant in an SEC enforcement action and class actions and even before its CEO was indicted for securities fraud, will be able to obtain fresh financing in the form of "additional equity, third party financing, and/or debt financing."

131.    Until the Receiver is able to liquidate the Shares, which Decision Diagnostics' wrongful actions as set forth above are preventing her from doing, the Receiver will be unable to complete the wind down of the Receivership Entities, thereby resulting in continuing irreparable harm to PPCO Master, ACR and its stakeholders, for which no adequate legal remedy is available.

132.     Further, if Decision Diagnostics has canceled the Shares, it may attempt to reissue them to another party, which would lead to competing rights in the Shares and dilute ACR's equity interests, thereby causing irreparable harm to ACR, PPCO Master and their investors and creditors.

133.     Upon information and belief, Decision Diagnostics believes that reducing the number of outstanding shares that can be sold on the market in the short term, including through its wrongful actions with respect to the Shares as set forth herein, will make it easier to obtain additional financing.

134.     During the process of having the Preferred Shares converted into Common Stock and having the restrictive legends removed from the Shares, the Receiver will be required to send the original Certificates to Decision Diagnostics or the Transfer Agent.  In light of all of the circumstances set forth above, the Receiver has good reason to be, and is, concerned that, if she sends the original Certificates for the Shares to Decision Diagnostics or the Transfer Agent, then Decision Diagnostics will not only refuse to process the requested conversions and remove the restrictive legends from the Shares, but will confiscate the Certificates, mark them as canceled, and/or otherwise destroy or deface them.  In light of this risk, the Receiver has not sent the original Shares, and instead sent copies, to Decision Diagnostics, and thereafter permitted Decision Diagnostics' counsel to inspect the originals of the Certificates (other than the Certificates bearing certificate numbers 13205 and 13209, which the Receiver and her counsel were not aware of until after that inspection had already taken place), and has acted reasonably in proceeding in that manner.  Once an Order of specific performance and a permanent injunction are entered, the Receiver will provide the original Certificates if needed in connection with the conversion of the Preferred Shares into Common Stock and the removal of the restrictive legends from the Shares.

135. Neither ACR nor the Receiver has notice of any adverse claim to ownership of, or any other interest held by any other person or entity in, any of the Shares.

136. Under the Receivership Order, the Receiver has actual authority to act on behalf of ACR including with respect to the Shares, to request and obtain the removal of the restrictive legends from the Shares, and to transfer or sell the Shares on behalf of ACR, and has provided Decision Diagnostics with reasonable assurance of such authority.

137. Upon information and belief, all laws relating to the collection of taxes with respect to the Shares have been complied with.

138. Upon information and belief, the removal of the restrictive legends from the Shares and any transfer of the Shares would not violate any restriction on transfer imposed by Decision Diagnostics in accordance with NRS § 104.8204.

139. Upon information and belief, no demand under NRS § 104.8403 has been made or become effective with respect to any of the Shares.

140. All requirements for removal of the restrictive legend from the Shares under NRS § 104.8401 have been satisfied.

### COUNT I

**(Declaratory Judgment Regarding Decision Diagnostics' Breach of Contract, the Implied Covenant of Good Faith and Fair Dealing Thereunder, and Applicable Law)**

141. The Receiver repeats and realleges each and every allegation set forth above as if fully set forth hereat.

142. There is an actual controversy between the Receiver, as receiver and agent, and Decision Diagnostics as to whether ACR earned and owns the Shares, with (i) Decision Diagnostics claiming, expressly or impliedly, that ACR did not earn the Shares, and (ii) the Receiver claiming that ACR earned and owns the Shares in accordance with the Loan Agreement

46

(including, without limitation, the Original Loan Agreement, the First Loan Amendment, the Note Renewal Agreement, the Second Loan Amendment, the December 2010 Letter Agreement, the Third Loan Amendment and the Fourth Loan Amendment) and the Organizational Documents (collectively, the "***Agreements***") as well as applicable law.

143.    There is an actual controversy between the Receiver, as receiver and agent, and Decision Diagnostics as to whether ACR procured the Shares through "actual fraud," with (i) Decision Diagnostics claiming, expressly or impliedly, that some or all of the Shares were procured through fraud, and (ii) the Receiver claiming that ACR earned all of the Shares and did not procure any of the Shares through fraud.

144.    There is an actual controversy between the Receiver, as receiver and agent, and Decision Diagnostics as to whether Decision Diagnostics lawfully, duly and properly canceled the Shares, whether under applicable law and the Agreements Decision Diagnostics was permitted to cancel the Shares, whether Decision Diagnostics is obligated to reverse its purported cancellation of and recognize the Shares, and whether, if Decision Diagnostics actually canceled any of the Shares, it is required to reinstate those Shares and/or reissue them to ACR, with (i) Decision Diagnostics claiming, expressly or impliedly, that it lawfully canceled the Shares and is not required to recognize or reinstate the Shares or reissue them to ACR, and (ii) the Receiver claiming that, under applicable law and the Agreements, Decision Diagnostics was not entitled to cancel any of the Shares, is required to reverse its purported cancellation of and recognize the Shares, and is required to reinstate and reissue to ACR any of the Shares that Decision Diagnostics canceled.

145.    There is a further actual controversy between the Receiver, as receiver and agent for ACR, and Decision Diagnostics as to whether Decision Diagnostics is required to convert

each of the Series B Preferred Shares into 15,000 shares of Common Stock, whether Decision Diagnostics is required to convert each of the Series E Preferred Shares into 14 shares of Common Stock, and whether Decision Diagnostics is required to honor and cooperate with any requests by the Receiver, on behalf of ACR, to effectuate those conversions, with (i) Decision Diagnostics claiming, expressly or impliedly, that it is not required to convert the Preferred Shares into Common Stock or to cooperate with any such conversion requests, and (ii) the Receiver claiming that, under the Agreements and applicable law, Decision Diagnostics is required to convert each of the Series B Preferred Shares into 15,000 shares of Common Stock, to convert each of the Series E Preferred Shares into 14 Shares of Common Stock, and to cooperate with any requests by the Receiver to effectuate those conversions.

146. There is an actual controversy between the Receiver, as receiver and agent, and Decision Diagnostics as to whether Decision Diagnostics was and is required to remove, and to cooperate with Receiver and such other persons and entities, including, without limitation, the Transfer Agent, as necessary to effectuate the removal of, the restrictive legends from the Shares, with (i) Decision Diagnostics claiming, expressly or impliedly, that it had and has no obligation to remove the restrictive legends from the Shares or to cooperate with any other persons or entities as necessary to effectuate that removal, and (ii) the Receiver claiming that, under applicable law and the Agreements, Decision Diagnostics was and is required to remove or cause the removal of the restrictive legends from the Shares and to cooperate with any other persons or entities as necessary to effectuate that removal.

147. There is an actual controversy between the Receiver, as receiver and agent, and Decision Diagnostics as to whether Decision Diagnostics is required to provide information requested by the Receiver, with (i) Decision Diagnostics claiming, expressly or impliedly, that it

has no obligation to provide documentation and information to the Receiver and that it is permitted to block the Receiver's attempts to obtain information from and interact with the Transfer Agent, and (ii) the Receiver claiming that Decision Diagnostics is required to provide documentation and information requested by the Receiver and to stop blocking the Receiver's attempts to obtain information from and otherwise interact with the Transfer Agent.

148. By reason of the foregoing, the Receiver is entitled to a declaratory judgment that, under the Agreements, the covenant of good faith and fair dealing implied therein, and/or applicable law including NRS § 78.211(1)-(3) and NRS § 104.8401:

(a) ACR earned and owns the Shares, and the Shares were not issued, and/or procured by ACR, as a result of any fraud;

(b) Decision Diagnostics is required to reverse its purported cancellation of and recognize the Shares, and, if Decision Diagnostics canceled any of the Shares, then it is required to reinstate those Shares and reissue them to ACR;

(c) Decision Diagnostics is required to convert each of the Series B Preferred Shares into 15,000 shares of Common Stock and each of the Series E Preferred Shares into 14 shares of Common Stock;

(d) Decision Diagnostics was and is required to remove the restrictive legends from the Shares, and to cooperate with all other persons and entities required as necessary to effectuate the removal of the restrictive legends from the Shares; and

(e) Decision Diagnostics is required to provide information reasonably requested by the Receiver and is required to stop blocking the Receiver's

attempts to obtain information from and otherwise interact with the Transfer Agent.

## COUNT II

### (Declaratory Relief Regarding Decision Diagnostics' Violations of the Receivership Order)

149. The Receiver repeats and realleges each and every allegation set forth above as if fully set forth hereat.

150. There is an actual controversy between the Receiver and Decision Diagnostics as to whether Decision Diagnostics has violated, and continues to violate, the Receivership Order by, among other things, purporting to cancel the Shares, refusing to recognize the Shares, refusing to reinstate and reissue to ACR any of the Shares that Decision Diagnostics canceled, refusing to convert the Preferred Shares into Common Stock, refusing to remove the restrictive legends from the Shares, refusing to cooperate with the Receiver, ACR and the Transfer Agent to effectuate compliance with those requirements, and blocking the Transfer Agent from providing, records and information to the Receiver, with (i) the Receiver claiming that the foregoing actions and/or inactions constitute violations of the Receivership Order, and (ii) Decision Diagnostics, expressly or implied, claiming the opposite.

151. Decision Diagnostics has been on notice of the provisions of the Receivership Order since May 2017.

152. Decision Diagnostics' actions violate the Receivership Order in numerous respects.

153. Having received notice of the provisions of the Receivership Order on at least four occasions since 2017, Decision Diagnostics was, and is, required to comply with the Receivership Order.

154.     Despite due demand, however, Decision Diagnostics has violated, and is continuing to violate, the provisions of the Receivership Order set forth above in the manner set forth above, and has refused to acknowledge its obligation to comply with the Receivership Order.

155.     By reason of the foregoing, ACR is entitled to a declaration that:

(a)     Decision Diagnostics has violated, and continues to violate, the Receivership Order by, among other things, purporting to cancel the Shares; refusing to recognize the Shares; to the extent it canceled the Shares, refusing to reinstate the Shares and reissue them to ACR; refusing to convert the Preferred Shares into Common Stock; refusing to remove the restrictive legends from the Shares; refusing to cooperate with the Receiver, ACR and the Transfer Agent to effectuate those requirements; and blocking the Transfer Agent from providing, records and information to the Receiver; and

(b)     in order to comply with its obligations under the Receivership Order, Decision Diagnostics is required to reverse its purported cancellation of and recognize and/or reinstate the Shares or reissue them to ACR; to convert the Preferred Shares into Common Stock; to remove the restrictive legends from the Shares; to cooperate with the Receiver, ACR and the Transfer Agent to effectuate compliance with those requirements; and to cause the Transfer Agent to provide records and information to the Receiver and stop blocking the Transfer Agent from providing, records and information to the Receiver.

## COUNT III

### (Order Compelling Removal of Restrictive Legends Pursuant to NRS § 104.8401)

156. The Receiver repeats and realleges each and every allegations set forth above as if fully set forth hereat.

157. Under NRS § 104.8401 and the applicable case law, the Receiver, on behalf of ACR, is entitled to an Order compelling Decision Diagnostics to remove the restrictive legends from, and to take all steps necessary to cause the removal of the restrictive legends from, the Shares.

## COUNT IV

### (Specific Performance of Decision Diagnostics' Contractual and Statutory Obligations)

158. The Receiver repeats and realleges each and every allegation set forth above as if fully set forth hereat.

159. The Agreements are all enforceable agreements between ACR and Decision Diagnostics, which ACR and the Receiver on its behalf are entitled to enforce.

160. ACR earned the Shares under and in accordance with the Agreements and applicable law including NRS § 78.211.

161. ACR did not procure the Shares through fraud.

162. The Agreements and NRS § 78.211 do not permit Decision Diagnostics to cancel the Shares where, as here, ACR earned them and did not procure them through fraud.

163. Decision Diagnostics breached, and continues to breach, the Agreements, and violated, and continues to violate, ACR's rights under NRS § 78.211, by, among other things:

      (a)      purporting to cancel the Shares;

(b)        refusing to recognize the Shares and/or refusing to reinstate and reissue to ACR any of the Shares that Decision Diagnostics canceled; and

(c)        refusing to cooperate with such other persons and entities as necessary in order to effectuate the reinstatement and/or reissuance of the Shares.

164.   Decision Diagnostics is further breaching the Agreements, including, without limitation, its obligations under Section 7.10 of the Loan Agreement, by failing to cooperate with such persons and entities as necessary to cause the reinstatement and reissuance to ACR of any Shares that were canceled.

165.   Because Decision Diagnostics was not permitted to cancel the Shares, the Agreements and NRS § 78.211 require Decision Diagnostics to reinstate and reissue to ACR any Shares that Decision Diagnostics canceled.

166.   By failing and refusing to convert the Series B Preferred Shares and the Series E Preferred Shares into Common Stock, Decision Diagnostics breached, and continues to breach, its obligations to ACR under the Agreements and applicable law.

167.   Decision Diagnostics is further breaching the Agreements, including, without limitation, its obligations under Section 7.10 of the Loan Agreement, by failing to cooperate with such persons and entities as necessary to effectuate the conversion of the Series B Preferred Shares and the Series E Preferred Shares into Common Stock.

168.   Decision Diagnostics breached, and continues to breach, its obligations to ACR under the Agreements, including, without limitation, its obligations under Section 2 of the Third Loan Amendment and under Section 2 of the Fourth Loan Amendment, and violated, and continues to violate, NRS § 104.8401, by failing and refusing to remove the restrictive legends from the Shares.

169.    Decision Diagnostics is further breaching the Agreements, including, without limitation, its obligations under Section 7.10 of the Loan Agreement, by failing to cooperate with such persons and entities as necessary to cause the removal of the restrictive legends from the Shares.

170.    Each of the applicable contractual and statutory provisions is reasonably definite and certain.

171.    ACR has tendered performance of all obligations under the Agreements insofar as necessary to require Decision Diagnostics to reinstate and reissue any of the Shares that it canceled, to convert the Series B Preferred Shares and the Series E Preferred Shares into Common Stock, and to remove the restrictive legends from the Shares.

172.    The Receiver, as receiver of PPCO Master and, in that capacity, as agent of ACR, has tendered copies of the Certificates to Decision Diagnostics, and stands ready, willing and able to tender the original Certificates for the Shares, along with the Rule 144 Opinion, to Decision Diagnostics and/or the Transfer Agent, after the Court orders Decision Diagnostics to specifically perform its obligations.

173.    Tendering the original Certificates for the Shares to Decision Diagnostics or the Transfer Agent before an Order of specific performance is entered would carry with it a serious risk that Decision Diagnostics would confiscate the Certificates, mark them as canceled, and/or otherwise destroy or deface them.

174.    The Receiver lacks an adequate legal remedy, and will suffer irreparable harm, if an Order of specific performance is not entered for at least four reasons.  Decision Diagnostics' actions are preventing the Receiver from carrying out her duties as Receiver to monetize the Shares, and thereby preventing her from closing out the Receivership Estate.  Further, Decision

Diagnostics is insolvent and its insolvency will further deepen as a result of the SEC's commencement of a civil enforcement proceeding against it and Berman, thereby rendering any award of money damages against Decision Diagnostics inadequate. Additionally, if Decision Diagnostics did cancel any of the Shares (as it claims) and reissued or reissues them to others, then multiple parties may assert conflicting rights in the Shares. Moreover, Decision Diagnostics' actions are placing the Receiver in the impossible position of having to choose between (a) sending the original Certificates for the Shares to Decision Diagnostics or the Transfer Agent in order to have the Preferred Shares converted into Common Stock and to have the restrictive legends removed, or (b) not doing so, in order to avoid the risk that Decision Diagnostics and/or Berman may engage in further improper actions with respect to the Shares once in their custody.

175. In light of the serious irreparable harm that ACR, the Receivership Estate and stakeholders in ACR will suffer if an Order of specific performance and a permanent injunction (as sought in Count V below) are not entered and the fact that the relief requested by the Receiver would merely compel Decision Diagnostics to do what it is legally required to do, the balancing of the hardships tips decidedly in favor of the Receiver and ACR. Further, Decision Diagnostics will not suffer irreparable harm if the Receiver is able to sell the Shares, and, in any event, has no legitimate rights to be protected here.

176. The public interest also favors an Order of specific performance. Decision Diagnostics and its indicted CEO should not be permitted to take advantage of Decision Diagnostics' shareholder, ACR, and thereby continue to harm innocent investors in the Receivership Entities.

177. Accordingly, the Receiver is entitled to an Order of specific performance directing Decision Diagnostics:

(a)     to reverse its purported cancellation of, and recognize, the Shares;

(b)     to reinstate the Shares and reissue them to ACR any Shares that were canceled;

(c)     to convert each of the Series B Preferred Shares into 15,000 shares of Common Stock;

(d)     to convert each of the Series E Preferred Shares into 14 Shares of Common Stock;

(e)     to cooperate with such other persons and entities as necessary to effectuate the conversion of the Series B Preferred Shares into Common Stock and the conversion of the Series E Preferred Shares into Common Stock;

(f)     to remove the restrictive legends from the Shares;

(g)     to cooperate with such persons and entities as necessary to effectuate the removal of the restrictive legends from the Shares; and

(h)     to provide the Receiver with such documentation and information as she may request with respect to the Shares.

## COUNT V

**(Permanent Injunction to Remedy and Prevent Breach of Contract, Breach of the Covenant of Good Faith and Fair Dealing, Unjust Enrichment, Violations of NRS §§ 78.211 and 104.8401, Conversion and Violations of the Receivership Order)**

178.    The Receiver repeats and realleges each and every allegation set forth above as if fully set forth hereat.

179.    Decision Diagnostics has violated, and continues to violate, ACR's and PPCO Master's rights under the Agreements, applicable law and the Receivership Order in numerous respects, giving rise to underlying claims by the Receiver, as receiver and agent, against Decision Diagnostics as set forth above.

180.    As set forth above, Decision Diagnostics breached, and continues to breach, the Agreements in the manner referred to in Counts I and IV above.

181.    In the alternative, if the Court determines that any of those actions are not breaches of the Agreements by Decision Diagnostics which the Receiver and ACR are entitled to enforce,

they are breaches by Decision Diagnostics of the implied covenant of good faith and fair dealing which is implied into all contracts, including the Agreements.

182.     Under the Agreements, Decision Diagnostics owes ACR, and the Receiver acting on ACR's behalf, a duty of good faith and fair dealing which required, and requires, Decision Diagnostics to deal fairly and in good faith with ACR and the Receiver in the performance of each of the Agreements.

183.     By engaging in the conduct set forth above after having obtained millions of dollars of benefit from ACR by issuing the Shares to ACR, Decision Diagnostics (a) is acting in a manner that is unfaithful and inimical to the purposes of the Agreements; (b) is destroying ACR's and the Receiver's justified expectations as a result of the Agreements, including their right and expectation that, after having given up millions of dollars of consideration for the Shares, they would be able to liquidate the Shares; (c) is unfairly depriving ACR and the Receiver of the fruits of ACR's provision of millions of dollars of benefits to Decision Diagnostics under the Agreements; and (d) by taking indefensible positions, is thwarting ACR's and the Receiver's attempts to exercise their rights under the Agreements.

184.     In the alternative, if the Court determines that the Agreements and the covenant of good faith and fair dealing thereunder do not grant the Receiver a remedy for Decision Diagnostics' wrongful actions described above, then Decision Diagnostics has unjustly enriched itself, and continues to unjustly enrich itself, at the expense of ACR.

185.     Through its actions described above, Decision Diagnostics has also violated, and continues to violate, its obligations to ACR under NRS §§ 78.211 and 104.8401.

186. Through its actions described above, Decision Diagnostics also has converted, and continues to convert, the Shares, which are assets of ACR that are property of the Receivership Estate.

187. Through its actions described above, Decision Diagnostics has also violated the Receivership Order in numerous respects.

188. Decision Diagnostics' wrongful actions are causing irreparable harm to the Receiver, the Receivership Estate, ACR and its stakeholders, including investors and creditors, in numerous respects, for which there is no adequate legal remedy because: (a) they are preventing the Receiver from carrying out her duties to monetize the Shares for the benefit of ACR, PPCO Master, the Receivership Estate and its stakeholders, for which there is no adequate legal remedy; (b) as a result of the recent commencement of an SEC civil enforcement proceeding against Decision Diagnostics and the indictment of its CEO, Berman, Decision Diagnostics is insolvent or soon to be insolvent, which will render any award of money damages against Decision Diagnostics inadequate; (c) if Decision Diagnostics reissues any Shares that it purportedly canceled to any other person or entities, then multiple parties will have conflicting rights in the Shares, and, even if the Shares are reinstated, ACR's interest in the Shares will be diluted; and (d) Decision Diagnostics' actions are placing the Receiver in the impossible position of having to choose between (i) sending the original Certificates for the Shares to Decision Diagnostics or the Transfer Agent in order to have the Preferred Shares converted into Common Stock and have the restrictive legends removed, or (ii) not doing so, in order to avoid the risk that Decision Diagnostics and/or Berman may engage in further improper actions with respect to the Shares once in their custody.

189. The balancing of the equities tips decidedly in favor of the Receiver and against Decision Diagnostics.

190. Accordingly, the Receiver is entitled to a permanent injunction, as receiver and agent on behalf of ACR and against Decision Diagnostics: (i) enjoining Decision Diagnostics and its attorneys, officers, directors and agents from further violating, and requiring Decision Diagnostics to comply with, Decision Diagnostics' obligations to ACR, (ii) enjoining Decision Diagnostics from continuing to violate the Receivership Order, and (iii) directing Decision Diagnostics (A) to reverse its purported cancellation of and recognize the Shares, (B) to reinstate and reissue to ACR any of the Shares that were canceled, (C) to convert the Preferred Shares into Common Stock, (D) to remove and cause the removal of the restrictive legends from the Shares, (E) to cooperate with the Receiver and such other persons or entities as necessary to effectuate such reinstatement, reissuance, conversion and removal, and in the Receiver's efforts to liquidate the Shares, (F) to provide the Receiver with such information and documentation as she may reasonably request in accordance with the Receivership Order, (G) to cease and desist from blocking the Receiver's interactions with the Transfer Agent, and (H) to comply with all obligations under the Receivership Order.

## COUNT VI

### (Breach of Contract – in the Alternative)

191. The Receiver repeats and realleges each and every allegation set forth above as if fully set forth hereat.

192. If the Court determines that the Receiver, on behalf of ACR, is not entitled to a permanent injunction or an order of specific performance against Decision Diagnostics for any reason (including, without limitation, based upon a determination that the Receiver has an

adequate remedy at law), then Decision Diagnostics is liable to the Receiver for damages for breach of contract.

193.   Decision Diagnostics has breached, and continues to breach, the Agreements by, among other things:

    (a)    purporting to cancel the Shares;

    (b)    refusing to recognize the Shares and/or refusing to reinstate and reissue to ACR any of the Shares that Decision Diagnostics canceled; and

    (c)    refusing to cooperate with such other persons and entities as necessary in order to effectuate the reinstatement and/or reissuance of the Shares.

194.   Decision Diagnostics has further breached, and continues to breach, the Agreements, including, without limitation, its obligations under Section 7.10 of the Loan Agreement, by failing to cooperate with such persons and entities as necessary to cause the reinstatement and reissuance to ACR of any Shares that were canceled.

195.   Because Decision Diagnostics was not permitted to cancel the Shares, the Agreements required, and continue to require, Decision Diagnostics to reinstate and reissue to ACR any Shares that Decision Diagnostics canceled.

196.   By failing and refusing to convert the Series B Preferred Shares and the Series E Preferred Shares into Common Stock, Decision Diagnostics breached, and continues to breach, its obligations to ACR under the Agreements.

197.   Decision Diagnostics has further breached, and is continuing to breach, the Agreements, including, without limitation, its obligations under Section 7.10 of the Loan Agreement, by failing to cooperate with such persons and entities as necessary to effectuate the

conversion of the Series B Preferred Shares and the Series E Preferred Shares into Common Stock.

198.    Decision Diagnostics has breached, and continues to breach, its obligations to ACR under the Agreements, including, without limitation, its obligations under Section 2 of the Third Loan Amendment and under Section 2 of the Fourth Loan Amendment, by failing and refusing to remove the restrictive legends from the Shares.

199.    ACR and the Receiver have complied with their applicable obligations under the Agreements.

200.    Decision Diagnostics' breaches of the Agreements prevented ACR and the Receiver from selling the Shares as their price traded at market prices as high as $.435 per share on August 5, 2020.

201.    Accordingly, if the Court determines that the Receiver, on behalf of ACR, is not entitled to an order of specific performance or a permanent injunction for Decision Diagnostics' breaches of the Agreements, then, in the alternative, by reason of the foregoing, the Receiver and ACR have sustained damages in an amount to be determined by the Court and/or at trial, which the Receiver is entitled to recover on behalf of ACR from Decision Diagnostics.

## COUNT VII

### (Breach of the Covenant of Good Faith and Fair Dealing – in the Alternative)

202.    The Receiver repeats and realleges each and every allegation set forth above as if fully set forth hereat.

203.    If the Court determines that the Receiver, on behalf of ACR, is not entitled to a permanent injunction or an order of specific performance against Decision Diagnostics for any reason (including, without limitation, based upon a determination that the Receiver has an adequate remedy at law), and that Decision Diagnostics did not breach the express provisions of

the Agreements, then Decision Diagnostics is liable to the Receiver and ACR for damages because it breached the implied covenant of good faith and fair dealing which is implied into all contracts, including the Agreements.

204.　Under the Agreements, Decision Diagnostics owes ACR, and the Receiver acting on ACR's behalf, a duty of good faith and fair dealing which required, and requires, Decision Diagnostics to deal fairly and in good faith with ACR and the Receiver in the performance of each of the Agreements.

205.　By engaging in the conduct set forth above after having obtained millions of dollars of benefit from ACR (including extensions of credit and the waiver of debt and interest) in exchange for issuing the Shares to ACR, Decision Diagnostics (a) is acting, and has acted, in a manner that is unfaithful and inimical to the purposes of the Agreements; (b) is destroying, and has destroyed, ACR's and the Receiver's justified expectations as a result of the Agreements, including their right and expectation that, after having given up millions of dollars of consideration for the Shares, they would be able to liquidate the Shares; (c) has unfairly deprived, and is unfairly depriving, ACR and the Receiver of the fruits of ACR's provision of millions of dollars of benefits to Decision Diagnostics under the Agreements; and (d) by taking indefensible positions, has thwarted, and is thwarting, ACR's and the Receiver's attempts to exercise their rights under the Agreements.

206.　Decision Diagnostics' breaches of the covenant of good faith and fair dealing implied into the Agreements prevented ACR and the Receiver from selling the Shares as their price traded at market prices as high as $.435 per share on August 5, 2020.

207.　Accordingly, if the Court determines that the Receiver, on behalf of ACR, is not entitled to an order of specific performance or a permanent injunction for Decision Diagnostics'

breaches of the covenant of good faith and fair dealing, and that the Receiver is not entitled to recover from Decision Diagnostics for breach of contract under the express provisions of the Agreements, then, in the alternative, by reason of the foregoing, the Receiver and ACR have sustained damages in an amount to be determined by the Court and/or at trial, which the Receiver is entitled to recover on behalf of ACR from Decision Diagnostics.

## COUNT VIII

### (Unjust Enrichment – in the Alternative)

208.   The Receiver repeats and realleges each and every allegation set forth above as if fully set forth hereat.

209.   If the Court determines that the Receiver, on behalf of ACR, is not entitled to a permanent injunction or an order of specific performance against Decision Diagnostics for any reason (including, without limitation, based upon a determination that the Receiver has an adequate remedy at law), and that Decision Diagnostics is not liable to the Receiver or ACR for breach of contract or breach of the implied covenant of good faith and fair dealing, then, in the alternative, Decision Diagnostics is liable to the Receiver and ACR for damages for unjust enrichment.

210.   ACR extended credit, and waived millions of dollars of debt, in exchange for the Shares.

211.   Decision Diagnostics has deprived the Receiver and ACR of the benefits of the Shares by taking actions that have prevented the Receiver, on behalf of ACR, from selling the Shares, while Decision Diagnostics common stock traded at prices as high as $0.435/share.

212.   Decision Diagnostics has thereby unjustly enriched itself at the expense of ACR and the Receiver, under circumstances in which it would be unjust to permit Decision Diagnostics to retain the benefit it obtained at their expense.

213.   Accordingly, if the Court determines that the Receiver, on behalf of ACR, is not entitled to an order of specific performance or a permanent injunction based upon Decision Diagnostics' unjust enrichment, and that the Receiver is not entitled to recover from Decision Diagnostics for breach of contract or breach of the covenant of good faith and fair dealing, then, in the alternative, by reason of the foregoing, Decision Diagnostics has been unjustly enriched at the expense of the Receiver and ACR, which the Receiver is entitled to recover on behalf of ACR from Decision Diagnostics.

## COUNT IX

### (Conversion – in the Alternative)

214.   The Receiver repeats and realleges each and every allegation set forth above as if fully set forth hereat.

215.   If the Court determines that the Receiver, on behalf of ACR, is not entitled to a permanent injunction or an order of specific performance against Decision Diagnostics for any reason (including, without limitation, based upon a determination that the Receiver has an adequate remedy at law), then, in the alternative, Decision Diagnostics is liable to the Receiver and ACR for damages for conversion.

216.   Through its actions described above, Decision Diagnostics has converted, and continues to convert, the Shares, which are assets of ACR and property of the Receivership Estate.

217.   Accordingly, if the Court determines that the Receiver, on behalf of ACR, is not entitled to an order of specific performance or a permanent injunction for Decision Diagnostics' acts of conversion described above, then, in the alternative, by reason of the foregoing, the Receiver and ACR have sustained damages in an amount to be determined by the Court and/or at trial, which the Receiver is entitled to recover on behalf of ACR from Decision Diagnostics.

# COUNT X

## (Damages Under NRS §§ 78.211 and 104.8401 – in the Alternative)

218.   The Receiver repeats and realleges each and every allegations set forth above as if fully set forth hereat.

219.   If the Court determines that the Receiver, on behalf of ACR, is not entitled to an order of specific performance or injunctive relief compelling Decision Diagnostics to comply with NRS §§ 78.211 and 104.8401 for any reason (including, without limitation, based upon a determination that the Receiver has an adequate remedy at law), then, in the alternative, Decision Diagnostics is liable to the Receiver and ACR for damages for under NRS §§ 78.211 and 104.8401 and the applicable case law, for refusing to remove the restrictive legend from, and to take all steps necessary to cause the removal of the restrictive legend from, the Shares.

220.   Through its actions in violation of NRS §§ 78.211 and 104.8401 and the applicable case law, Decision Diagnostics has deprived the Receiver and ACR of the benefits of the Shares by taking actions that have prevented the Receiver, on behalf of ACR, from selling the Shares, while Decision Diagnostics common stock traded at prices as high as $0.435/share.

221.   Accordingly, if the Court determines that the Receiver, on behalf of ACR, is not entitled to an order of specific performance or injunctive relief compelling Decision Diagnostics to comply with NRS §§ 78.211 and 104.8401, then, in the alternative, by reason of the foregoing, the Receiver and ACR have sustained damages in an amount to be determined by the Court and/or at trial, which the Receiver is entitled to recover on behalf of ACR from Decision Diagnostics.

## COUNT XI

### (Damages for Violation of the Receivership Order and the Original Receivership Order – in the Alternative)

222. The Receiver repeats and realleges each and every allegations set forth above as if fully set forth hereat.

223. Decision Diagnostics' actions, as set forth above, violate the prohibitions in the Receivership Order and in the Original Receivership Order against:

(f)     "[i]nterfer[ing] with the Receiver's efforts to take control, possession, or management of any Receivership Property…," including but not limited to "using self-help" or "other process for the purpose of impounding or taking possession of or interfering with … any Receivership Property";

(g)     "[h]inder[ing], obstruct[ing] or otherwise interfer[ing] with the Receiver in the performance of the Receiver's duties…," including but not limited to "concealing … records or information";

(h)     "[d]issipat[ing] or otherwise diminish[ing] the value of any Receivership Property," including but not limited to by "releasing claims or disposing, transferring, exchanging, assigning or in any way conveying any Receivership Property, enforcing … claims against any Receivership Property or any Receivership Entities" or "attempting to modify, cancel, call, extinguish [or] revoke … any … loan,… indebtedness, security agreement or other agreement … which … affects any Receivership Property"; and/or

(i)     "[i]nterfer[ing] with or harass[ing] the Receiver, or interfere in any manner with the exclusive jurisdiction of this Court over the Receivership Estate."

(Receivership Order, ¶¶ 22(A)-(D); Original Receivership Order ¶¶ 23(A)-(D)).

224. Decision Diagnostics' actions also violate the provisions of the Receivership Order stating that:

•     "[a]ll persons and entities having control, custody or possession of any Receivership Property are hereby directed to turn such property over to the Receiver" (Receivership Order ¶ 10; Original Receivership Order ¶ 11);

•     all Notice Parties "having possession of the property, business, books, records, accounts or assets of the Receivership Entities are hereby directed to deliver the same to the Receiver, the Receiver's agents and/or

employees" (Receivership Order, ¶ 11; Original Receivership Order ¶ 12); and

- "[a]ll … persons or entities which have possession, custody or control of any assets or funds held by, in the name of, or for the benefit of, directly or indirectly, … the Receivership Entities that receive actual notice of [the Receivership] Order … shall … [n]ot exercise any form of set-off, alleged set-off, lien, or any form of self-help whatsoever, or refuse to transfer any funds or assets to the Receiver's control without the permission of this Court; and [shall] … [c]ooperate expeditiously in providing information and transferring funds, assets and accounts to the Receiver or at the direction of the Receiver." (Receivership Order, ¶ 12; Original Receivership Order ¶ 13).

225. Accordingly, if the Court determines that the Receiver, on behalf of ACR, is not entitled to an order of specific performance of Decision Diagnostics' obligations under the Receivership Order and the Original Receivership Order, or a permanent injunction enjoining further violations of those Orders, then, in the alternative, by reason of the foregoing, the Receiver and ACR have sustained damages from Decision Diagnostics' violations of the Receivership Order and/or the Original Receivership Order in an amount to be determined by the Court and/or at trial, which the Receiver is entitled to recover on behalf of ACR from Decision Diagnostics, or, in the alternative, the Court should impose an appropriate sanction against Decision Diagnostics.

**WHEREFORE,** the Receiver demands entry of a final judgment as follows:

(a)     On Count I, awarding the Receiver a declaratory judgment that: (i) ACR earned and owns the Shares; (ii) Decision Diagnostics had and has no right to cancel any of the Shares; (iii) Decision Diagnostics is required to reverse any purported cancellation of the Shares; (iv) Decision Diagnostics is required to reinstate any of the Shares that were canceled and reissue them to ACR; (v) Decision Diagnostics is required to convert the Preferred Shares into Common Stock at the conversion rates of 15,000 common shares for each of the Series B Preferred Shares and 14 common shares for each of the Series E Preferred Shares; (vi) Decision Diagnostics is required to cooperate with other all persons and entities insofar as necessary to carry out those obligations; (vii) Decision Diagnostics is required to provide documentation and information to the Receiver as requested; and (viii) Decision Diagnostics is required to stop blocking the Receiver's attempts to obtain information from and to interact with the Transfer Agent;

(b)     On Count II, awarding the Receiver declaratory judgment that Decision Diagnostics' failure to comply with its obligations set forth in (a)(ii)-(viii) above violates the Receivership Order, and that the Receivership Order requires Decision Diagnostics to comply with those obligations;

(c)     On Count III, compelling Decision Diagnostics to remove, or cause the removal of, the restrictive legends from the Shares;

(d)     On Count IV, issuing an Order of specific performance directing Decision Diagnostics to comply with its contractual and statutory obligations under NRS §§ 78.211 and 104.8401: (i) to reverse its purported cancellation of and recognize the Shares; (ii) to reinstate and reissue to ACR any of the Shares that Decision Diagnostics may have canceled; (iii) to convert each of the Series B Preferred Shares into 15,000 shares of Common Stock and convert each of the Series E Preferred Shares into 14 shares of Common Stock; (iv) to remove or cause the removal of the restrictive legends from the Shares; (v) to cooperate with the Receiver and such other persons or entities as necessary to effectuate such reversal, reinstatement, reissuance, conversion and removal, and in the Receiver's efforts to liquidate the Shares for the benefit of ACR, PPCO Master and stakeholders; and (vi) to provide the Receiver with such documentation and information as she may reasonably request regarding the Shares;

(e)     On Count V, awarding a permanent injunction to the Receiver, as receiver and agent for ACR, and against Decision Diagnostics:  (i) enjoining Decision Diagnostics from continuing to violate its obligations to ACR set forth in (a)(ii)-(viii) above, and enjoining its attorneys, officers, directors and agents, from causing Decision Diagnostics to continue to violate such obligations; (ii) directing Decision Diagnostics (A) to reverse its purported cancellation of and recognize the Shares, (B) to reinstate and reissue to ACR any of the Shares that were canceled, (C) to convert the Preferred Shares into Common Stock, (D) to remove the restrictive legends from the Shares, (E) to cooperate with the Receiver and any other persons or entities as necessary to effectuate such reinstatement, reissuance, conversion and removal, and in the Receiver's efforts to liquidate the Shares, (F) to provide the Receiver with such information and documentation as she may reasonably request in accordance with the Receivership Order, (G) to cease and desist from blocking the Receiver's interactions with the Transfer Agent, and (H) to comply with the Receivership Order; and (iii) enjoining Decision Diagnostics and its attorneys, officers, directors and agents from violating the Receivership Order;

(f)     On Count VI, if the Court determines that the Receiver, on behalf of ACR, is not entitled to a permanent injunction or an order of specific performance against Decision Diagnostics for any reason, including, without limitation, based upon a determination that the Receiver and/or ACR has an adequate remedy at law, then, in the alternative, awarding damages in favor of the Receiver, on behalf of ACR, and against Decision Diagnostics, in an amount to be determined by the Court and/or at trial;

(g)     On Count VII, if the Court determines that the Receiver, on behalf of ACR, is not entitled to a permanent injunction or an order of specific performance against Decision Diagnostics for any reason, including, without limitation, based upon a determination that the Receiver and/or ACR has an adequate remedy at law, and that the Receiver is not entitled to recover from Decision Diagnostics for breach of contract under the express provisions of the Agreements, then, in the alternative, awarding damages in favor of the Receiver, on behalf of ACR, and against Decision Diagnostics, in an amount to be determined by the Court and/or at trial;

(h)     On Count VIII, if the Court determines that the Receiver, on behalf of ACR, is not entitled to a permanent injunction or an order of specific performance against Decision Diagnostics for any reason, including, without limitation, based upon a determination that the Receiver and/or ACR has an adequate remedy at law, and that Decision Diagnostics is not liable to ACR for breach of contract or breach of the covenant of good faith and fair dealing, then, in the alternative, awarding damages in favor of the Receiver, on behalf of ACR, and against Decision Diagnostics, in an amount to be determined by the Court and/or at trial;

(i)     On Count IX, if the Court determines that the Receiver, on behalf of ACR, is not entitled to a permanent injunction or an order of specific performance against Decision Diagnostics for any reason, including, without limitation, based upon a determination that the Receiver and/or ACR has an adequate remedy at law, then, in the alternative, awarding damages in favor of the Receiver, on behalf of ACR, and against Decision Diagnostics, in an amount to be determined by the Court and/or at trial;

(j)     On Count X, if the Court determines that the Receiver, on behalf of ACR, is not entitled to injunctive relief and/or an order of specific performance against Decision Diagnostics under NRS §§ 78.211 and 104.8401 for any reason, including, without limitation, based upon a determination that the Receiver and/or ACR has an adequate remedy at law, then, in the alternative, awarding damages in favor of the Receiver, on behalf of ACR, and against Decision Diagnostics, in an amount to be determined by the Court and/or at trial;

(k)     On Count XI, if the Court determines that the Receiver, on behalf of ACR, is not entitled to an order of specific performance of Decision Diagnostics' obligations under the Receivership Order and the Original Receivership Order, or a permanent injunction enjoining further violations of those Orders, then, in the alternative, awarding damages in favor of the Receiver, on behalf of ACR, and against Decision Diagnostics, in an amount to be determined by the Court and/or at trial, or imposing an appropriate sanction against Decision Diagnostics;

(l)     Awarding the Receiver, as receiver and agent, its costs of prosecuting this action under Section 7.6 of the Loan Agreement and otherwise; and

(m)     Granting the Receiver and ACR such other and further relief as the Court deems just and appropriate.

Dated:  New York, New York
      November 29, 2021

**OTTERBOURG P.C.**

By:    */s/ Andrew S. Halpern*
    Andrew S. Halpern

    Adam C. Silverstein
    (asilverstein@otterbourg.com)
    Erik B. Weinick
    (eweinick@otterbourg.com)
    Andrew S. Halpern
    (ahalpern@otterbourg.com)
    230 Park Avenue
    New York, New York 10169
    Tel.:  (212) 661-9100

    *Attorneys for Plaintiff Melanie L.*
    *Cyganowski, as Receiver for Platinum*
    *Partners Opportunities Master Fund L.P.,*
    *and, in that capacity, as agent on behalf of*
    *Alpha Credit Resources LLC*